UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CALVIN FLETCHER,                        )
                                        )
                    Plaintiff,          )
                                        )
        VS.                             ) No. 4:14-CV-999(RLW)
                                        )
JOSEPH TOMLINSON, NICHOLAS MARTORANO,   )
JOHN MOTON and JONATHAN CARROLL,        )
                                        )
                    Defendants.         )
_____)

JURY TRIAL PROCEEDINGS -- VOLUME I
BEFORE THE HONORABLE RONNIE L. WHITE
AUGUST 8, 2016
ST. LOUIS, MISSOURI

FOR THE PLAINTIFF:

    MARK H. ZOOLE
    MARK H. ZOOLE, P.C.
    P.O. Box 190549
    St. Louis, MO  63119
    (314) 223-0436

    PHILLIP A. TATLOW
    BOLLWERK AND TATLOW, LLC
    10525 Big Bend Boulevard
    St. Louis, MO  63122
    (314) 315-8111

FOR THE DEFENDANTS:

    HENRY F. LUEPKE, III
    JILLIAN MEEK MUELLER
    ATTORNEY GENERAL OF MISSOURI
    815 Olive Street, Suite 200
    St. Louis, MO  63101
    (314) 340-7652

Proceedings recorded by mechanical stenography;
transcript produced by computer.
_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
111 South Tenth Street, Third Floor
St. Louis, MO  63102
(314) 244—7449

```
 1                        I N D E X

 2              AUGUST 8, 2016; VOLUME I

 3

 4   MATTERS BEFORE THE COURT . . . . . . . . . . . . . . .   4

 5   Plaintiff's
     Witnesses:        Direct     Cross     Redirect    Recross
 6

 7   STEVEN ARKIN, M.D.  62         99        115         118

 8   JONATHAN CARROLL   120        146        155

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (PROCEEDINGS BEGAN AT 9:00 AM.)

 2              THE COURT:  All right, gentlemen.  Are we ready to

 3    proceed?

 4              MR. LUEPKE:  Yes.

 5              THE COURT:  We are here in the matter of

 6    Calvin Fletcher, Sr., the Plaintiff, versus Joseph Tomlinson,

 7    et al., Defendants.  The Case Number is 4:14-CV-0999(RLW).

 8              I understand that there are a few pretrial matters we

 9    need to take up before we start our trial this morning.  Who

10    would like to go first?

11              MR. TATLOW:  Plaintiff, Your Honor, if that's all

12    right.

13              THE COURT:  Go right ahead.

14              MR. TATLOW:  My name is Phillip Tatlow.  We've -- I

15    got the pleasure of talking to you on the phone recently at

16    the pretrial.  And as I recall, Motion in limine No. 4 had to

17    deal with the sexual orientation and the HIV status, and we

18    agreed or it was resolved that the sexual orientation would

19    not be discussed but the HIV status remain.  And the reason I

20    wanted to take that up is that there are some exhibits that we

21    separately object to which are identified in Defendant's

22    exhibit list, and primarily those are Z, BB, and CC.  And

23    those objections have to do primarily with they're laced with

24    irrelevant information on an infectious disease, HIV, and

25    that's primarily what they talk about.  They're all mentioning
```

```
 1    infectious disease, and it really wasn't for -- primarily for

 2    the injury.  It's for unrelated collateral matters that don't

 3    affect his health to his alleged fractures of the face, the

 4    brain injury to the cavernoma that bled, or to his kidneys.

 5    And there's no doctor that says that HIV relates to those

 6    conditions.  So we really think it's prejudicial and can

 7    influence the jury.  So we think the HIV shouldn't be talked

 8    about and that those records that I mentioned should be

 9    barred.  We also aren't seeking damages for the Barnes, and we

10    aren't going to present evidence except for we agreed AA that

11    they have would be admissible.  That was primarily due to

12    headaches from the trauma, and we were introducing that

13    ourselves.  So that was the argument on the HIV, Your Honor.

14           THE COURT:  Let me hear from Mr. Luepke.  Oh, pardon

15    me.

16           MS. MUELLER:  Good morning, Your Honor.  I'm

17    Jillian Mueller for the defense.

18           THE COURT:  "Miller"?

19           MS. MUELLER:  Mueller.

20           THE COURT:  Mueller, okay.  Go ahead.

21           MS. MUELLER:  Your Honor, as we made this argument at

22    pretrial, we believe that the HIV status, separate from the

23    Plaintiff's sexual orientation is, indeed, relevant to

24    damages.  As the Plaintiff's attorney has just argued, it's

25    written all over his medical records that he has this
```

1    pre-existing condition, and we think that specifically as it

2    relates to the issue of his damages and to any injury that may

3    have existed previous because of the HIV or any other

4    infectious disease, that we should be able to raise that issue

5    specifically as regards to damages.  We have no intention of

6    bringing up the Plaintiff's sexual orientation or speculating

7    how the HIV might -- might relate to his sexual orientation.

8    That is not our intent.  It is specifically as regards to

9    damages.

10        THE COURT:  Here's how I envision this happening.

11   Plaintiffs put on a doctor or either the Plaintiff that says,

12   "These injuries are caused by HIV status."  You should be

13   allowed at a minimum to say that there could have been another

14   cause.  Mention it but not harp on it; not make another case

15   out of it, but at least indicate that there is another

16   possible cause.

17        Now if you don't say that, then they don't get to say

18   what they're saying, but if the Plaintiff or any of his

19   witnesses try to act as if the only causation of it was the

20   beating as it relates to his kidneys, then I think it's only

21   fair that they get to mention it.

22        MS. MUELLER:  And just for clarity sake, Your Honor,

23   one of the issues that has been discussed is whether or not we

24   need to redact the word "HIV" out of all of these medical

25   records that are already -- it's already written there.

1          MR. TATLOW:  May I clarify something, Your Honor?

2          THE COURT:  Go ahead.

3          MR. TATLOW:  We do not maintain this HIV has anything

4    to do with this.  It was from some prior situation, and we

5    don't claim it aggravated or affected it in any way, nor will

6    our doctor say that or any other doctor.  So no one's going to

7    claim that affected it.

8          THE COURT:  Does that satisfy your concerns?

9          MS. MUELLER:  Only as -- I'm concerned about big

10   white boxes on the medical records that they intend to enter

11   into evidence when the jury could reasonably conclude that

12   kidney damage was caused by noncompliance with HIV medication

13   just as easily as they could conclude that it was caused by

14   any alleged beating.

15         MR. TATLOW:  Well, Your Honor, I think that would

16   take a medical expert, and they didn't hire one or conclude

17   that, and the medical experts have not said that.  No one has

18   ever alleged that.  Redacting that in hundreds of pages of few

19   redactions would be inconspicuous and wouldn't be -- hurt

20   either side in my opinion, Your Honor.

21         THE COURT:  Ms. Mueller?

22         MS. MUELLER:  Again, Your Honor, I mean we're --

23   we're discussing testimony that may or may not be elicited

24   from the doctor.  If it the doctor -- I don't see how the

25   doctor could possibly testify that no pre-existing condition

```
 1    was considered in formulating his opinion or in -- in -- in

 2    analyzing the Plaintiff's injuries.  I simply don't understand

 3    how that could be possible.

 4            THE COURT:  Mr. Tatlow?

 5            MR. TATLOW:  Yes, Your Honor.  They -- He was

 6    deposed, and no one asked him about that, and nor did he say

 7    the HIV affected any of the injuries in this case.  He's not

 8    going to testify to that.  And what I would say is if he did,

 9    it might be fair game for them, but we don't intend to elicit

10    any testimony that this HIV had anything to do with it,

11    Your Honor.

12            THE COURT:  Well, at this point I'm going to hold in

13    in abeyance again my ruling until I hear what the doctor has

14    to say.  If he goes there, then they'll get a chance to

15    cross-examine him on that issue, Mr. Tatlow.

16            MR. TATLOW:  Very well, Your Honor.

17            THE COURT:  All right.  Your next one.

18            MR. TATLOW:  Yes.  The other one, it was another

19    Defendants' exhibit.  And Mr. Luepke and I -- I'm not sure

20    that we have an agreement, but Defendant DD is a handwritten

21    or a typed letter that's not an affidavit and it's hearsay,

22    written by Wash. U to a prior attorney, Jeff Herman.  It has

23    to do with kidneys.  Our doctor did not -- was not ever

24    provided that, never reviewed it, never relied on it, and at

25    the end it's inadmissible hearsay.  So we stand by our
```

1   objection to DD.

2          THE COURT:  Mr. Luepke?

3          MR. LUEPKE:  Yeah, Your Honor.  We're in agreement on

4   that.  I just wanted to confirm that their expert witness had

5   not considered or reviewed the -- the expert opinion of

6   another witness.

7          THE COURT:  So your agreement is what?

8          MR. LUEPKE:  The agreement is that we will not be

9   offering that into evidence based on the representation that

10  his expert had not reviewed or relied upon that letter.

11         THE COURT:  Okay.  That takes care of that issue.

12  What else?

13         MR. ZOOLE:  Your Honor, we just -- for the record,

14  the Plaintiffs will be invoking the exclusionary rule and

15  asking non-party witnesses to be excluded from the courtroom

16  during the trial portions that they're not testifying.

17         THE COURT:  Mr. Luepke, are the gentlemen at your

18  table all party witnesses?

19         MR. LUEPKE:  They are, Your Honor.

20         THE COURT:  Okay.

21         MR. LUEPKE:  And we don't intend to have any other

22  witnesses in court during their testimony.

23         THE COURT:  So the folks over here won't be excluded.

24         MR. ZOOLE:  That's -- Understood, Your Honor.  And

25  I'm not suggesting -- I did not think they were.  I just

1    thought generally putting everybody on -- on notice.

2            Mr. Luepke and I had a very productive telephone

3    conversation on Friday.  Most, if not all, of the exhibits are

4    now agreed to.  Plaintiff does now anticipate this case can be

5    tried to conclusion in three days.

6            THE COURT:  Or less.

7            MR. ZOOLE:  Or less.

8            THE COURT:  I suspect that since the exhibits have

9    been agreed to, there won't be any need for foundation and

10   those things.  We can just talk about them and get them

11   admitted as they come up.

12           MR. ZOOLE:  I think that's correct, yes.

13           MR. LUEPKE:  Yes.

14           THE COURT:  Okay.

15           MR. ZOOLE:  Also, Your Honor, there was a slight

16   disagreement between us that -- that we neglected to get

17   resolved in our phone conversation.  It was a disagreement

18   over what the ruling had been with respect to marijuana usage.

19   I had ordered the transcript, and -- and our understanding

20   from reading the transcript is that Mr. Luepke had said that

21   he intended to use Mr. Fletcher's marijuana use as of that

22   day, which was around 11:30 to noon that day, for the

23   purpose -- limited purpose of showing potential memory loss as

24   to what happened later on that evening and no other drug

25   usage.  And the Court ruled that that usage was permissible.

1    In an e-mail conversation from earlier in the week before our

2    phone call where we forgot to address this, I had the

3    impression that maybe he was going into other drug usage

4    beyond that, and we didn't get a chance to confirm that.  And

5    I met with him out in the hall about another matter, and I

6    forgot to raise that, so.

7            MR. LUEPKE:  I don't intend to bring up

8    Mr. Fletcher's other -- other drug uses because of -- that it

9    was from long ago.

10           THE COURT:  It's not relevant.

11           MR. LUEPKE:  It's not relevant.  But his frequent use

12   of marijuana is relevant he used it that day, and the fact

13   that he was a frequent user of marijuana, I think, is relevant

14   and should come into evidence.

15           MR. ZOOLE:  That's ---

16           THE COURT:  I'm going to limit it to the marijuana

17   that he allegedly used that day because if we talk about

18   frequent use, then that can get into other matters.

19           MR. LUEPKE:  Okay.

20           THE COURT:  Anything else?

21           MR. ZOOLE:  The only other point, Your Honor, was

22   with respect to the Motion *in limine* on other charges,

23   convictions.  I did agree with Mr. Luepke that certain

24   exhibits could come in that showed that Mr. Fletcher had

25   warrants outstanding as of the time.  What was not resolved,

```
 1   though, was -- and I don't know whether he plans to get into

 2   this, but there is -- there are allegations that Mr. Fletcher

 3   was literally driving a car that day while he didn't have a

 4   license or while he was suspended.  That was never a charge.

 5   There was never a warrant on that.  We think it's well before

 6   this incident, and we think it's inadmissible under Rule 403;

 7   more prejudicial and confusing the Jury.

 8            THE COURT:  Mr. Luepke?

 9            MR. LUEPKE:  Your Honor, this goes again to why he

10   was resisting arrest that day.  This case is about resisting

11   arrest.  He was ---

12            THE COURT:  He was resisting arrest because he may

13   have been wanted on the charge of driving without a license or

14   something?

15            MR. LUEPKE:  He was driving a car without a valid

16   driver's license.

17            THE COURT:  Go ahead.

18            MR. ZOOLE:  That was the charge that -- There had

19   been a warrant out for him, and I understood and I agreed with

20   Mr. Luepke there had been a charge from 2011 where he had been

21   driving while suspended, and there was a failure to appear on

22   it.  Okay.  I've agreed that comes in.  I'm talking about this

23   very day, hours -- hours before this incident because they

24   didn't pull him over.  He was walking along the street when

25   this encounter happened.  This very day, what I'm trying to
```

1    keep out is his having driven a car allegedly that day without

2    a license.  That was never a charge.  There was never a

3    warrant.  It's not part of the arrest.  It's not why they

4    pulled him over.

5              THE COURT:  What are you intending to do, Mr. Luepke?

6              MR. LUEPKE:  I'm intending to show why Mr. Fletcher

7    resisted arrest, and he was guilty that day of driving a car

8    he did not own without a valid driver's license.  It goes to

9    motive.  If he can say -- If he can say on the stand that that

10   had nothing to do with why he was resisting arrest, he can say

11   that, but I get to ask him about that.

12             THE COURT:  He -- He was not charged with driving

13   without a license, was he?

14             MR. LUEPKE:  No, sir.

15             MR. ZOOLE:  And they didn't pull him over for that.

16   He was walking at the time.  He had left the car blocks away.

17   They -- They never saw him drive.  They never suspected him.

18             THE COURT:  Was he driving -- Will be there testimony

19   that he was driving a car at the time he was arrested?

20             MR. LUEPKE:  No.

21             THE COURT:  I'm going to exclude ---

22             MR. LUEPKE:  But it goes to his motive, Your Honor.

23             THE COURT:  I'm going to exclude it.

24             All right.  Anything else?

25             MR. ZOOLE:  Not from the Plaintiff, Your Honor.  Oh,

1    I'm sorry.

2          MR. TATLOW:  We were seeking to introduce an exhibit

3    of Dr. Berns that had never been objected to until Thursday.

4    We filed some -- The Plaintiff was seeking to read it.  The

5    Defendant has objected as of Thursday, so I thought we ought

6    to take that up.

7          THE COURT:  Ms. Mueller?

8          MS. MUELLER:  Yes.  So a little bit of background,

9    Your Honor.  Dr. Berns, who's on the Plaintiff's "May Call"

10   list -- excuse me -- and who they have designated portions of

11   his deposition, we were made aware on Thursday that actually

12   they have no intention of calling Dr. Berns but still wish to

13   read his deposition into evidence.  And Dr. Berns had

14   previously been designated by a co-defendant as an expert but

15   not by the Plaintiff.  As the Plaintiff did not designate him

16   himself and as Rule 804(a) of the *Federal Rules of Evidence*

17   says that if the declarant is not unavailable for the factors

18   listed in 804(a) but simply was hired to come to trial, his

19   deposition testimony is inadmissible hearsay.

20         THE COURT:  Were you present or your office present

21   during the deposition of Dr. Berns?

22         MS. MUELLER:  We were, Your Honor, but ---

23         THE COURT:  And you had a chance to cross-examine

24   him?

25         MS. MUELLER:  We did, Your Honor.

1      THE COURT:  I'm going to allow Defendants to use the

2  depo designations that were made to cross-examining anything

3  that Dr. Berns testifies in this trial.

4      MS. MUELLER:  Okay.  And we would just like to

5  preserve our objection.

6      THE COURT:  Sure.

7      MR. TATLOW:  Your Honor, if I may clarify, we were

8  going to call him by deposition.  We designated the portions

9  of the deposition to read into evidence.  We did list him as a

10  "May Call" but elected not to call him when they didn't object

11  to the depo designations filed on 7-19, and we presumed they

12  consented to it because no one ever objected to it under the

13  pretrial order or filed a Motion *in limine*.  We done that

14  deposition in January, and everyone knew what he was going to

15  say.  They did a 73-page Cross of him, the Defendants.

16  Everyone knew the opinion that the trauma caused the kidneys,

17  and that was a defense expert.  So we intended to read it, but

18  we put him on the "May Call" just in case.  But we made a

19  decision not to call him, and he wrote me -- I called him

20  after Mr. Luepke called me about this and asked him if he was

21  available and he said, "No.  I'll be practicing medicine in

22  Chicago."  He sent me a letter, and I attached it as an

23  exhibit.

24      THE COURT:  Mr. Luepke, is that your understanding

25  about Mr. Berns?  That he's not available because he's busy

1    practicing medicine?

2              MR. LUEPKE:  No, Your Honor.  This is the first I've

3    ever heard of it.

4              MR. TATLOW:  I -- Your Honor?

5              THE COURT:  Did you share a copy of your letter,

6    Mr. Tatlow, with Mr. Luepke?

7              MR. TATLOW:  I filed that with the pretrial, and I

8    filed it all.  And he's -- he is a neurologist in Chicago at

9    Northwestern.  So under the rules, he's unavailable.  He's

10   more than 100 miles away under the other witness rules, but

11   he's also -- When a physician is practicing, he's unavailable.

12   And that letter, I shared it with him yesterday.  I sent

13   e-mails to Mr. Luepke with our documents, and he isn't

14   available to come.  So we think the deposition's admissible.

15             MS. MUELLER:  May I respond, Your Honor?

16             THE COURT:  Sure.

17             MS. MUELLER:  Your Honor, just to be clear, as

18   Dr. Berns was on the "May Call" list, we were not made aware

19   that he would not be appearing until Thursday afternoon.  We

20   believed, and I think we had reason to, that if deposition

21   testimony was designated and the witness was on the "May Call"

22   list, that the witness would be present and we would have the

23   opportunity to cross-examine them for trial.  Now I think to

24   say that an e-mail that was sent at 8:00 PM last night

25   alerting us to this supposed unavailability of this witness in

```
 1   no way provides notice regarding his -- the reasons for his

 2   unavailability.

 3          Also, Federal Rule 32 specifically states that

 4   deposition testimony may be read in if the witness is 100

 5   miles away, assuming that the party offering the testimony did

 6   not engineer the unavailability of the witness themselves

 7   which by making a strategic decision not to call him in person

 8   and not informing us until after pretrial had been completed,

 9   I think that -- that is exactly what the rule is

10   contemplating.

11          THE COURT:  You're not suggesting that Plaintiff's

12   counsel engineered the Doctor's unavailability, are you?

13          MS. MUELLER:  I'm suggesting, Your Honor, ---

14          THE COURT:  I mean he's filed a letter that's part of

15   the record of the court that indicates he can't be here

16   because he's practicing medicine.

17          MS. MUELLER:  Well, Your Honor, the fact that this

18   was so late in the game didn't give us the opportunity to say

19   anything about it when we were here previously doing pretrial.

20   We thought he was going to be here to testify live based on

21   the "Will Call" or on the "May Call" list as on the testimony

22   being offered and, thus, we had no reason to object.  Letting

23   us know informally after pretrial had been completed that,

24   "Oh, we actually aren't planning on calling him," I think,

25   led -- we had been led to believe he would be here live.  We
```

1   had no objections based on that and, therefore, we didn't --

2   we did not object.  So saying that the reason that it should

3   come in is because we did not object, I think, misstates the

4   timeline.

5            THE COURT:  Mr. Tatlow?

6            MR. TATLOW:  Your Honor, I think it goes further than

7   that.  They had the opportunity to depose him.  We all deposed

8   him, and I paid thousands of dollars for it.  I paid for their

9   Cross, and it was as long or longer than my Direct, and they

10  grilled him about everything.  And it would be -- They've --

11  He's already established admissible testimony in a deposition,

12  and all parties knew about it.  Another person designated him.

13  And when we did the pretrial, I filed the deposition saying,

14  "I will read these."  The "May Call" list is for people you

15  might want to call during trial, but they never objected to

16  any of that pursuant to the Court order.  And had they asked

17  me, I would say, "I don't know if I'll call him or read it,

18  but I intend to do one or the other."  But they already had

19  the chance to depose him, and it's far more -- it's

20  prejudicial to Mr. Fletcher not to be able to use it because

21  it goes to his kidney injuries from this assault.  And I

22  assumed, I guess incorrectly, everyone knew he was a possible

23  witness.  He was on the Defendants' designations.  He

24  testified.  We all had the opportunity to depose him, and it

25  was something that was very important to all parties.

1          In retrospect, I would have said, "Hey, I'm going to

2     make him my witness," but I didn't think I had to because he

3     was an opposing party's witness, and I listed him pursuant to

4     the Court order with his deposition testimony.

5          THE COURT:  Don't you think they didn't object at

6     pretrial because the person who put forth the doctor as a

7     witness was no longer a party to this case?

8          MR. TATLOW:  No, because when I did the pretrial on

9     7-19, it listed all of the deposition parts I intended to

10    read.  And had they thought about it, they could have

11    counter-designated their Cross.  And as an accommodation, if

12    they want to do that, I would be fine to have them read the

13    Cross that took place because it was 70 pages, and it goes

14    into extensive detail.  If he were here live, it wouldn't add

15    anything.  They already crossed him on his qualifications, his

16    causation opinions, and whether it was based on a reasonable

17    degree of certainty.

18         THE COURT:  All right.  Here's what I want you to do:

19    I want you to let them know what parts of his deposition

20    you're going to play, and then you respond with your

21    counter-depo designations and objection to it as your Cross,

22    and then that should resolve that issue.

23         MR. TATLOW:  Thank you, Your Honor.

24         THE COURT:  But you're going to have to work on that

25    while we're trying the case.

1           MS. MUELLER:  All right.  Thank you, Your Honor.

2           MR. TATLOW:  Thank you, Your Honor.

3           THE COURT:  Both sides have submitted proposed intro

4    jury instructions to my law clerk, Ms. Baker.  Is there any

5    objection to the proposed instructions submitted by the

6    parties to be read to the jurors?

7           MR. ZOOLE:  The copy that I received from the Court,

8    that's what the Court plans to read?

9           THE COURT:  Yes.

10          MR. ZOOLE:  We had no objections to it.

11          MR. LUEPKE:  Nor do we, Your Honor.

12          THE COURT:  All right.  You may be seated.

13          Here's what we're going to do.  We're going to take

14   about a ten-minute break.  Then I'm going to have Ms. Blasko

15   bring the jury in it and we'll start the trial.  So we'll be

16   in recess for ten minutes.

17          THE CLERK:  All rise.

18          MR. ZOOLE:  Thank you.

19          THE CLERK:  Court is now in recess.

20          (Court recessed from 9:30 AM until 9:40 AM.)

21          THE COURT:  You may be seated.  Good morning.

22          JURY PANEL:  Good morning.

23          THE COURT:  Good!  You spoke back to me!  I

24   appreciate that.

25          You're in Division 10 South.  I'm Judge Ronnie White,

1    U.S. District Court Judge.

2           This morning I was supposed to have the duty of jury

3    orientation, to greet you when you were downstairs, and I

4    apologize that no one was there to greet you from the court

5    other than our Clerk.  But welcome, and we're glad you showed

6    up for jury duty.

7           Before the Court is the matter of *Fletcher versus*

8    *Tomlinson*, Case No. 4:14-CV-999.

9           Are the parties ready to proceed?

10          MR. ZOOLE:  Plaintiff is, Your Honor.

11          MR. LUEPKE:  Defense is ready, Your Honor.

12          (Jury Voir Dire conducted by the Court and counsel at

13   this point and not ordered transcribed; Court continued with

14   the following proceedings at 12:50 PM.)

15          THE CLERK:  All rise.  Court is again in session.

16          THE COURT:  You may be seated.

17          All right.  Court is back in session.  Members of the

18   Jury, when we call your name, please step forward and have a

19   seat in the jury box.

20          THE CLERK:  Juror No. 1, Christopher Morris.

21          Juror No. 2, Sherry McCrory.  Sorry; you will be

22   Juror No. 2 now, not what the number said.  Thank you.

23          This is going to be Juror 3:  Georgia Rostirolla.

24          Okay, sorry.  Juror No. 4 is going to be

25   Christopher Labon.

```
1              Juror No. 5 is going to be Jacqueline Scott.

2              Juror No. 6 will be Frankie Perry.

3              7 is going to be Rachel Bolinger.

4              And 8 is Roy Saffold.

5              THE COURT:  Ms. Blasko, I'm going to have you swear

6    in those jurors who are seated in the jury box.

7              THE CLERK:  Please stand and raise your right hands.

8              You and each of you do solemnly swear that you will

9    well and truly try the issues here enjoined and a true verdict

10   rendered according to the law and evidence, so help you God.

11             THE JURY:  So help me God; yes.

12             THE CLERK:  Thank you.

13             THE COURT:  For those of you folks who are still

14   seated out in the gallery, I want to thank you for coming here

15   today.  You were not selected, but that doesn't mean that your

16   participation wasn't important, and jury service is a very

17   important deal.  People like you who are willing to come to

18   court to serve as prospective jurors really make our system of

19   justice work, and we could not function without you.

20             I've been informed that your jury service is no

21   longer needed for today or tomorrow and that you will be

22   excused now until the next time you're called to report for

23   jury service.  So on behalf of myself and my colleagues,

24   thanks for coming down.  And I'm going to have your badges

25   collected, and you can get your personal effects together
```

1    before you leave.

2              (The remainder of the jury pool was excused from the

3    courtroom.)

4              THE COURT:  You may be seated.

5              Members of the jury, I want you to take a look at the

6    seats you're in and make sure that you know where you are, and

7    you're to sit in that seat every day throughout this trial.

8              If you cannot ever hear me during the trial, please

9    let me know.

10             There will be no note taking and no transcripts will

11   be available in in the Jury Room.  You will not be allowed to

12   ask questions of any of the witnesses.  That's the jobs of the

13   lawyers.

14             Do any of you have any questions of me before we

15   begin this case?

16             (No show of hands.)

17             THE COURT:  And, Mr. Saffold, I just want to say if

18   you need to take a break, raise your hand, and I'll let the

19   lawyers know and we'll take a break.  That's not a problem.

20             JUROR NO. 8:  I'll watch my water intake.

21             THE COURT:  So will I.

22             All right.  Ladies and Gentlemen of the Jury, I'm now

23   going to give you some instructions about this case and about

24   your duties as jurors.

25             At the end of trial, I will give you more

1    instructions.  I may also give you instructions during the

2    trial.  All instructions, those I give you now and those I

3    give you later, whether they're in writing or given to you

4    orally, are equally important and you must follow them all.

5            You must turn off your cell phones, PDAs,

6    Smartphones, iPhones, tablet computers and any other wireless

7    communication devices during the trial and may only use them

8    during the breaks.  However, you are not allowed to have these

9    devices in the Jury Room doing your deliberations.  You may

10   give them to the Court Clerk for safekeeping just before you

11   start to deliberate.  They will be returned to you when your

12   deliberations are complete.

13           As I indicated earlier, this is a civil case brought

14   by the Plaintiff, Calvin Fletcher, against Defendants

15   Joseph Tomlinson, Nicholas Martorano, John Moton and Jonathan

16   Carroll.

17           On the evening of March 6th, 2013, Plaintiff Calvin

18   Fletcher was arrested by four St. Louis police officers:

19   Joseph Tomlinson, Nicholas Martorano, John Moton and

20   Jonathan Carroll.  Mr. Fletcher claims that these four

21   officers, who are defendants in this case, used excessive

22   force against him during the arrest process.  The officers'

23   position is that any force used on Mr. Fletcher was reasonable

24   because they claim Mr. Fletcher was resisting arrest.

25           It will be your duty to decide from the evidence

1    whether the Plaintiff is entitled to a verdict against the

2    Defendants.  Your duty is to decide what the facts are from

3    the evidence.  You are allowed to consider the evidence in the

4    light of your own observations and experiences.

5            After you have decided what the facts are, you will

6    have to apply those facts to the law which I will give you in

7    these and in my other instructions.  That is how you will

8    reach your verdict.  Only you will decide what the facts are.

9    However, you must follow my instructions whether you agree

10   with them or not.  You have taken an oath to follow the law

11   that I give you in my instructions.

12           In deciding what the facts are, you may have to

13   decide what testimony you believe and what testimony you do

14   not believe.  You may believe all of what a witness says or

15   only part of it or none of it.

16           In deciding what testimony to believe, consider the

17   witness' intelligence, their opportunity to have seen or heard

18   the things they testify about, their memories, any reasons

19   they might have to testify a certain way, how they act while

20   testifying, whether they said something different at another

21   time, whether their testimony is generally reasonable, and how

22   consistent their testimony is with other evidence that you

23   believe.

24           Do not let sympathy or your own likes or dislikes

25   influence you.  The law requires you to come to a just verdict

1   based only on the evidence, your common sense, and the law I

2   give you in my instructions and nothing else.

3          Nothing I say or do during this trial is meant to

4   suggest what I think of the evidence or what I think your

5   verdict should be.

6          When I use the word "evidence," I mean the testimony

7   of witnesses, documents and other things I receive as

8   exhibits, facts that I tell you the parties have agreed are

9   true, and any other facts that I tell you to except as true.

10         Lawyers' statements, arguments, questions and

11  comments are not evidence.  Documents or other things that

12  might be in court or talked about but that I do not receive as

13  exhibits are not evidence.  Objections are not evidence.

14  Lawyers have a right and sometimes a duty to object when they

15  believe something should not be part of the trial.

16         Do not be influenced one way or the other by

17  objections.  If I sustain a lawyer's objections to a question

18  or an exhibit, that means the law does not allow you to

19  consider that information.  When that happens, you have to

20  ignore the question or the exhibit and you must not try to

21  guess what the information might have been.

22         Testimony and exhibits that I strike from the record

23  or tell you to disregard are not evidence, and you must not

24  consider them.

25         Anything you see or hear about this case outside the

1    courtroom is not evidence, and you must not consider it unless

2    I specifically tell you otherwise.

3            Also, I might tell you that you can consider a piece

4    of evidence for one purpose only and not for any other

5    purpose.  If that happens, I will tell you what purpose you

6    can consider the evidence for and what you are not allowed to

7    consider it for.

8            Some of you may have heard the terms "direct

9    evidence" and "circumstantial evidence."  You should not be

10   concerned with these terms since the law makes no distinctions

11   between the weight to be given to the direct and

12   circumstantial evidence.

13           Sometimes during trial I will need to talk privately

14   with the lawyers.  I may talk with them here at the bench

15   while you're in the courtroom or I may call a recess and let

16   you leave the courtroom while I talk with the lawyers.  Either

17   way, please understand that while you're waiting, we are

18   working.  We have these conferences to make sure the trial is

19   proceeding according to the law and to avoid confusion or

20   mistakes.  We will do what we can to limit the number of these

21   conferences and to keep them as short as possible.

22           At the end of trial you will have to make your own

23   decision based on what you recall of the evidence.  You will

24   not have a written copy of the testimony to refer to.  Because

25   of this, you have to pay close attention to the testimony and

1    other evidence as it is presented here in the courtroom.

2            Jurors, to make sure this trial is fair to all

3    parties, you must follow these rules.

4            First, do not talk or communicate among yourselves

5    about this case or anyone involved with it until the end of

6    the case when you go to the Jury Room to consider your

7    verdict.

8            Second, do not talk with anyone else about this case

9    or about anyone involved in it until the trial has ended and

10   you have been discharged as jurors.

11           Third, when you're outside the courtroom, do not let

12   anyone tell you anything about the case or about anyone

13   involved with it until the trial has ended and your verdict

14   has been accepted by me.  If someone tries to talk to you

15   about the case during trial, please report it to the bailiff

16   or the deputy clerk.

17           Fourth, during the trial, do not talk with or speak

18   to any of the parties, lawyers or witnesses in this case, not

19   even to pass the time of day.  It is important not only that

20   you do justice in this case but also that you act accordingly.

21   If a person from one side of the lawsuit sees you talking to

22   another person from the other side, even if it's just about

23   the weather, that might raise a suspicion about your fairness.

24   So when the lawyers and parties do not speak to you, talk to

25   you in the halls or on the elevator or the like, you must

1    understand that they're not being rude.  They know they're not

2    supposed to talk to you while the trial is going on, and they

3    are just following those rules.

4           Fifth, you may need to tell your family, close

5    friends and other people that you're part of this trial.  You

6    can tell them when you have to be in court, and you can warn

7    them not to ask you about the case, tell you anything they

8    know or think they know about the case, or talk about the case

9    in front of you.  But you must not communicate with anyone or

10   post information about parties, witnesses, participants,

11   claims, charges, evidence or anything else related to this

12   case.

13          You must not tell anyone anything about the jurors'

14   deliberation until this case -- until this -- until after I

15   accept your verdict or until I give you specific permission to

16   do so.  If you talk about the case with someone besides the

17   other jurors during deliberation, it looks as if you might

18   already have decided the case or that you might be influenced

19   in your verdict by their opinions.  That would not be fair to

20   the parties, and it might result in a verdict being thrown out

21   and the case having to be tried over again.

22          During trial, while you're in the courthouse and

23   after you leave for the day, do not give any information to

24   anyone or by any means about this case.  For example, do not

25   talk face to face or use any electronic device, such as a

1    telephone, cell phone, Smartphone, Blackberry, PDA, computer

2    or computer-like device.  Likewise, do not use the Internet or

3    any Internet service.  Do not text or send Instant Messages.

4    Do not go on any Internet chat room, blog or other websites,

5    such as Facebook, MySpace, YouTube or Twitter.  In other

6    words, do not communicate with anyone about this case except

7    the other jurors during deliberations until I accept your

8    verdict.

9          Sixth, do not do any research on the Internet, in

10   libraries, newspapers or otherwise.  Do not investigate this

11   case on your own.  Do not visit or view any place discussed in

12   this case.  Do not use the Internet or other means to search

13   for or view any place discussed in the testimony.  Also, do

14   not look up any information about this case, the law, or

15   people involved, including the parties, the witnesses, the

16   lawyers or the judge.

17         Seventh, do not read any news stories or Internet

18   articles or blogs that are about the case or about anyone

19   involved with it.  Do not listen to any radio or television

20   reports about the case or about anyone involved with it.  In

21   fact, until the trial is over, I suggest you avoid reading any

22   newspapers or news journals at all and avoid listening to any

23   television or radio newscasts at all.  I do not know whether

24   there will be news reports about this case, but if there are,

25   you might accidentally find yourself reading or listening to

1    something about the case.  If you want, you can have someone

2    clip out any stories and set them aside to give you after the

3    trial is over.  I can assure you, however, that by the time

4    you have heard all of the evidence in this case, you will know

5    all you need to know to return a just verdict.

6         The parties have a right to have you decide their

7    case based only on the evidence submitted here in the court.

8    If you research, investigate or experiment on your own or get

9    information from other sources, your verdict might be

10   influenced by inaccurate, incomplete or misleading

11   information.  Witnesses here in court take an oath to tell the

12   truth, and the accuracy of their testimony is tested through

13   Cross Examination.  All of the parties are entitled to a fair

14   trial and an impartial jury, and you have to conduct

15   yourselves in a way that ensures the integrity of the trial

16   process.  If you decide a case based on information not

17   admitted in court, you will deny the parties a fair trial.

18   You will deny them justice.  Remember, you have taken an oath

19   to follow the rules, and you must do so.  If you do not, the

20   case might have to be retried, and you could be held in

21   contempt of court and possibly punished.

22        Eighth, do not make up your mind during the trial

23   about what your verdict should be.  Keep an open mind until

24   after you and your fellow jurors have discussed all of the

25   evidence in the case.

```
 1          The trial will proceed in the following manner.
 2   First, the Plaintiff's lawyer will make an opening statement.
 3   Next, the Defendants' lawyer may make an opening statement.
 4   An opening statement is not evidence but is a summary of the
 5   evidence the lawyers expect you will see and hear during the
 6   trial.
 7          After opening statements, the Plaintiffs will then
 8   present evidence.  The defense lawyer -- Defendants' lawyers
 9   will have an opportunity to cross-examine Plaintiff's
10   witnesses.  After the Plaintiff has finished presenting his
11   case, the Defendants may present evidence, and the Plaintiff's
12   lawyer will have a chance to cross-examine their witnesses.
13          After you have seen and heard all of the evidence
14   from both sides, the lawyers will make closing statements that
15   summarize and interpret the evidence.  Just as with opening
16   statements, closing arguments are not evidence.
17          And after closing arguments, I will instruct you
18   further on the law, and you will go to the Jury Room to
19   deliberate and decide on your verdict.
20          Plaintiff's counsel, you may proceed with opening
21   statement.
22          MR. ZOOLE:  Thank you, Your Honor.
23          And, Your Honor, for the record, pursuant to the
24   Court's standing rule, there will be certain exhibits that
25   counsel have already stipulated to as to the entry that may be
```

1   used during opening statement from both sides.

2          THE COURT:  And please make note of that so the

3   record will be clear.

4          MR. ZOOLE:  Yes, Your Honor.

5          In March of 2013 Calvin Fletcher was lying in a

6   hospital bed in the Intensive Care Unit at St. Louis

7   University Hospital.  That was within just two weeks after he

8   had been arrested by four St. Louis police officers, the four

9   Defendants here.  He had spent two weeks in their jail --

10  actually one week in their jail, one week in another jail, and

11  then was rushed over to that hospital because his kidneys had

12  shut down completely and he was almost dead.

13         He was lying there in that bed with his kidneys not

14  functioning, near death.  He had had his eye socket broken.

15  He had had his nose broken.  He had been hit so hard in the

16  head that his brain was bleeding internally, and he had no

17  kidney function.

18         Now how did that happen?

19         Well, on March 6th, 2013, at 8:21 PM Mr. Fletcher was

20  walking to the Mobil gas station over at Cass and 13th.  Now

21  some of you may remember that intersection.  That's where the

22  old Greyhound Bus Station used to be.  Some of you might, who

23  are my vintage old, might remember that Greyhound Bus Station

24  there.  It closed several years ago, but the building is still

25  there, and you'll actually be able to see it in a video that

1    you're going to see.

2          Mr. Fletcher was walking toward that intersection by

3    himself.  He's a -- You can see he's a slender guy.  He's

4    about 5'8; about 150, 155 pounds.  He was unarmed, and he

5    wasn't carrying any -- any drugs or anything like that on him.

6    He was wearing some slightly baggy pants, and he was wearing

7    something on his head; a doo rag or a skull cap or something

8    like that in that neighborhood.

9          Now Mr. Fletcher had been cutting through an alley

10   that runs just parallel to -- Here, if this is -- if this is

11   Cass, there's a little alley that runs parallel to it.  I'll

12   do that.

13         So he's walking through an alley that runs parallel

14   to Cass right there.  As he got about here, there's a parking

15   lot in this area right here, right there, and he noticed a

16   police car at the Mobil gas station here at the corner.  This

17   would be the corner of 13th and Cass.  And the police car was

18   here in the Mobil gas station parking lot right there.

19         So he turned left.  He got to the end of the alley,

20   walked down the sidewalk toward the corner.  And as he

21   approached that intersection, he saw the patrol car again.  It

22   had pulled off the Mobil lot and was approaching that corner

23   right there.  And he did what any sensible person would do,

24   walking toward a police car when the police car was coming

25   toward him and it just pulled off the lot and was driving

```
1    toward him.  He did what any sensible guy in his position
2    would do, a lone African-American man walking in that part of
3    the city.  He did exactly what he had been doing before.  He
4    didn't do anything to call attention to himself.  He just kept
5    on walking in the same direction and minding his own business.
6         At that point we know that there were at least three
7    City of St. Louis policemen in that patrol car:
8    Mr. Tomlinson, Mr. Moton, and Mr. Martorano.  Now they said
9    that they didn't notice Mr. Fletcher until he was about ten
10   feet or so away from them; about a car length away from them.
11   Well, here's what the St. Louis police, the three policemen
12   here, say that they saw.
13        The first one to notice him was Mr. Tomlinson, the
14   gentleman in the suit behind me.  He said that he saw a lone
15   African-American male standing around by himself, not walking
16   he says in the parking lot.  It would be this parking lot
17   right here, what he said was an abandoned property.  The
18   business there is a Rib Shack.  He says that Mr. Fletcher was
19   only about ten feet away from the patrol car when he saw him,
20   but that he doesn't think that Mr. Fletcher had noticed them
21   in their patrol car.  It was a marked patrol car with a roll
22   bar on top, but he says he didn't -- he didn't think
23   Mr. Fletcher had noticed that.  He says that he noticed that
24   Mr. Fletcher made a move, that he looked down at his hip and
25   he made a move towards his waistband, adjusting something in
```

1     his waistband is what he says.

2          And he called the attention of the other two officers

3     in the car with him, and they decided to get out of the car

4     and approach him.  And they say as they decided to do that and

5     they got out, Mr. Fletcher noticed them.  He said Mr. Fletcher

6     was surprised and that he threw something out of his pocket.

7          And this "something out of the pocket" made

8     Mr. Tomlinson suspicious.  He says he ran over and looked at

9     it, and, lo and behold, it looked like drugs.  It looked like

10    crack cocaine.  So he called out that he was under arrest.

11    Well, that "thing," whatever it was, Mr. Fletcher says he

12    didn't -- he threw nothing out of his pockets, of course,

13    having noticed a police car.  And the "thing" that was taken

14    to the lab and analyzed you'll see from the lab work was not

15    drugs at all.  It was nothing at all.  Certainly nothing

16    contraband.  The lab doesn't say what it was, but it wasn't

17    anything illegal or contraband, this "thing" that the officers

18    later on brought there.

19         So so far at this point Mr. Fletcher has not done

20    nothing at all that is illegal, and, yet, these officers at

21    8:21 jumped out of their car and started running at him.

22         Now I said 8:21, and that sounds awfully exact.  The

23    way I know that is from the officers having radioed in that

24    they were about to go approach him.  This is from -- I'll

25    clear that out.

1          You can see right here at 8:21, this is where the

2    officers are saying that they're going to go and approach.

3    They've called in and said, "We're about to go approach this

4    guy."  That was at 8:21 PM.  And these -- This sheet on -- on

5    Exhibit 15 that you'll see tracks all the radio traffic that

6    went on related to this incident.  This was produced to us by

7    the -- by the St. Louis Police.

8          So at 8:21 PM, that's when they jumped out at him.

9    Now so far nothing's horrendously unusual about this scenario

10   that I've painted for you.  It doesn't sound terribly safe or

11   wonderful but nothing terribly unusual.

12         There were a couple of things unusual.  You note that

13   I mentioned that there were three policemen in that car

14   together.  That was somewhat unusual.  The officers say that

15   normally it was Mr. Martorano, the big fellow here at the end;

16   Mr. Tomlinson, the fellow in the suit.  They were partners.

17   They were partners together, and that was their normal beat,

18   their normal thing that they did together.

19         And Mr. Moton, actually his partner wasn't there that

20   day.  For whatever reason, he was, as he describes it, the odd

21   man out, and he was sitting in the back seat.  Mr. Martorano

22   was driving.  And Mr. Tomlinson, the two regular partners,

23   Martorano and Tomlinson, were in the front seat.

24   Mr. Tomlinson was in the front passenger; Mr. Martorano

25   driving.  Officer Moton, the one who didn't have a partner

1    that night, he was the odd man out, sitting in the back seat.

2         Mr. Moton is the gentleman right behind me, the

3    African-American officer here behind me to my right.

4         Something else unusual:  These three guys, and you'll

5    see as they walk up to the stand, they're big fellows.

6    Mister -- Mr. Moton at six feet, right around 180 pounds, is

7    the shrimp of the bunch.  Mr. Tomlinson runs a little over six

8    feet, about 200 pounds.  Mr. Martorano is 6'4, 240.  They were

9    all fully armed, equipment at their belt, and wearing full

10   body armor, the big vests that you've seen.  So they present

11   quite -- quite the sight coming out of the car.

12        So not one or two but three policemen get out of the

13   police car and start coming at Mr. Fletcher.  They surprised

14   him, and he started backpedaling away from them.  And at times

15   he even turned slightly.  He didn't run, turn and run in a

16   full flight.  He sort of did this kind of number here, like

17   wondering if somebody else, and he did move away from them.

18        And at this point it was a very short pursuit, but

19   something happened.  Mr. Martorano, the big -- the big fellow

20   here who had been driving, he fell.  He fell over something on

21   the sidewalk, he thinks, or on the street, and he fell and he

22   thinks he cut his hand at this point.

23        Well, the first one -- the first one of these

24   policemen to get to Mr. Fletcher was apparently Mr. Moton.

25   And he says that Mr. Fletcher was backpedaling at the time and

1    fell down on his back side.  And he got up to him and kind of

2    caught up to him there as Mr. Fletcher is sitting on his back

3    side, facing back toward the patrol car.

4         The versions of the events now start depending on who

5    you're listening to at this point.  Mr. Fletcher said that at

6    this point as he was sitting up, the officer had fallen, the

7    bigger guy, Mr. Martorano.  He got up.  He was only a few

8    steps away from him, came up and smacked him nice and hard on

9    the left side of his face right here, right in the forehead,

10   right above the eye, and that this was a heavy blow with some

11   type of an object that he didn't recognize.  It was a small

12   leather-like hard thing that was smooth in -- in the palm of

13   his hand.

14        This, obviously, dazed him and hurt him.  And then he

15   says that all three of them -- Officers Tomlinson, Martorano,

16   and Moton -- were suddenly on him, hitting him and kicking him

17   and hitting him with something pretty hard in his legs and

18   back mainly as he was trying to squirm and protect himself.

19   He says he did yell.  He was yelling, trying to attract some

20   help or at least the attention of some witness; hoping

21   somebody would -- would see this and -- and maybe videotape it

22   or come help or at least be a witness.  But he's yelling there

23   on the street or on the sidewalk.  It's right -- right in the

24   area there at Cass, right behind the patrol car.  This is at 8

25   -- about 8:23, 8:24 PM.

1           Now the officers have a different story to this.

2    They say that as Officer Moton caught up with him, he sort of

3    set him down on the ground and that -- or actually he says

4    that Mr. Fletcher fell on the ground.  He came up to him.  And

5    then as soon as he and Mr. Martorano, so Officer Moton and

6    Officer Martorano got up to him, that Mr. Fletcher became a

7    wild man and that he was down on his stomach, holding his arms

8    underneath him, thrashing and kicking them with all his might,

9    and that he fought with the strength of many men and that the

10   two of these guys could not get his arms out from under him to

11   save their life.  And they were worried they said because,

12   after all, Mr. Fletcher had been seen, at least by

13   Mr. Tomlinson's report, to have been reaching in his waistband

14   earlier.  So they say they were very worried about this

15   because they couldn't get his arms out.

16           So Officer Moton took out his baton.  It's an ASP.

17   It's a collapsible baton.  The ASP is the brand name for it,

18   and he started beating on him.  He says he hit him in the

19   peroneal nerve; that he targeted his blows to only hit the

20   back of his leg just above the knee.  Mr. Fletcher will tell

21   you that he felt something very hard hit him several times on

22   his back.  And at the hospital later on we see linear wounds

23   on the man's back.

24           The -- The officers say that this continued for a

25   while and, despite all this, the two of them working on him,

1    they say -- Mr. Tomlinson -- Mr. Tomlinson does think he got

2    there, by the way, while these other two officers were trying

3    to get his arms out from under him or hitting -- Mr. Moton was

4    hitting him with the baton.  The other two officers actually

5    don't think Mr. Tomlinson got there at that point.

6           But in any event, this went on for about a minute or

7    so when Mr. Martorano decided, according to his testimony,

8    that he would taser Mr. Fletcher.  So he says he asked for

9    Mr. Moton's Taser because Mr. Martorano didn't normally carry

10   one.  He got it, and he says he tasered him twice.  And this

11   in the police report.  They say that they did this, and that

12   that caused the resistance to cease, and they were able to get

13   Mr. Fletcher handcuffed.

14          Now Mr. Fletcher says he was not tasered at this

15   point.  He says all he was trying to do was not get beaten

16   anymore.  After about a minute or so, it stopped, and they

17   handcuffed him.  He obeyed whatever commands they gave, but

18   the only command they gave him was, "Get up," as they were

19   yanking him up, and they took him to the patrol car.

20          There is no video, unfortunately, of that part of the

21   event.  We can't see from a video whose version is right or

22   wrong.  This happened behind the patrol car.  The patrol car

23   itself did not have a dashboard camera in it.  A different

24   video -- A different police vehicle that came later did and,

25   unfortunately, no witnesses, no third-party witnesses have

1    come forward saying, "This is what I saw," or, "This is what I

2    didn't see."  So you're taking the parties' word for it to

3    this point in the story.

4         But all of them do agree that after about a minute or

5    two of whatever happened there, the officers led Mr. Fletcher

6    to the patrol car, put him on -- put him inside the patrol

7    car, and there the versions of the story differ again.  The

8    officers say inside the patrol car Mr. Fletcher was a wild man

9    again; was rocking and kicking.  You could see the patrol car

10   moving.  He was trying to get out of his handcuffs or slip

11   them in front of him.  They say he started climbing into the

12   front seat.  And this, they say, worried them because they had

13   their rifle in the front seat, and they didn't know what to

14   do.  They said it was a hard time just to get the man to the

15   patrol car; that he was still a wild man as they tried to get

16   him there to the patrol car; that he was fighting back against

17   these three officers by himself.

18        The patty wagon was called for.  It was dispatched to

19   the scene at 8:26 PM.  You see that right here.  Where is it?

20   It's right there.  That's Officer Carroll, the gentleman with

21   the mustache seated back there.  He's the one driving the

22   patty wagon.  They sometimes call it the "cruiser" or "the

23   prisoner transport."  We'll probably call it "patty wagon"

24   more often than not, but it's a big -- it's a police car.

25   It's a van.  It's been modified.  It has a cage in it.  It's

1    designed to -- to carry prisoners.

2            So it's dispatched to the scene at 8:26, and you see

3    that it arrives at 8:29 to the scene.

4            Now there's no radio traffic, you'll see, for 49 --

5    for 20 minutes after that; from 8:29 to 8:49.  Yeah, there's

6    no radio traffic.  At 8:49 Sergeant Simeone is called to the

7    scene.  In that 20 minutes, the three officers say from the

8    time they decided to take him out and they were waiting for

9    the patty wagon to come, as the patty wagon arrived, while --

10   while they then got into the patty wagon, throughout this

11   whole time, that Mr. Fletcher was just crazy out of control;

12   that it took all three of them, all their might, even though

13   he was in handcuffs all this time, just to control him.

14           And we do have a video of the patty wagon as it pulls

15   up to the scene.  We do have a video of the scene that shows

16   this area where the officers say they had him outside the car,

17   up against the panel, trying to control him.  He was crazy.

18           And the video is downloaded.  And the video was

19   subpoenaed, and it's been produced, and you'll get to see it.

20   And it shows the scene as the -- as the patty wagon drives up

21   to where this is going on.  Now what you see in that scene is

22   nothing.  You see three officers standing around next to a

23   patrol car, talking like they were having a cup of coffee, and

24   you don't see Mr. Fletcher anywhere in that video at all.

25           Now Mr. Fletcher says that when he was put in the

1    patrol car, he saw things that he had never seen in a patrol

2    car before.  He saw a jacket.  He saw a cell phone.  He saw a

3    lunch bag or two or something that looked like a bag, and he

4    didn't know what was inside.  And immediately, because he

5    didn't know why he had been arrested in the first place or why

6    they came out after him, he immediately thought, "I'm being

7    set up for something; I'm being framed here."  And he said he

8    started yelling, "This stuff isn't mine," hoping somebody

9    would hear this or hoping that an audio recording, if one was

10   going on somewhere, would pick this up, a denial of this stuff

11   being his in case there was drugs or something like that in

12   the bag.  And he yelled as loud as he could to try to get

13   anybody to hear him.

14        He says after he yelled for a while, the officers

15   took him out of the car, told him to shut up, and started

16   beating him again.  At this point, having been hit in the head

17   the way he would have been before and now being hit again

18   handcuffed, he came in and out of consciousness at various

19   points.  At some point after that, he says he felt a Taser

20   shock while he was lying on the ground handcuffed.

21        Now there is no video of the tasering because when

22   the officer pulled up on the scene, Mr. Carroll, with the

23   patty wagon, he had the video on.  Remember, I told you it

24   shows the officers standing there.  The next thing you see as

25   soon as he stops the patty wagon is nothing.  The camera goes

```
 1   off, and it never comes back on again, even though there's a

 2   departmental rule that says it's supposed be on throughout an

 3   arrest process.  Even though there's a departmental rule that

 4   says it's supposed to be on while anybody's being transported

 5   in that patty wagon, ---

 6            THE COURT:  Excuse me, counsel.

 7            MR. ZOOLE:  Yes, Your Honor.

 8            THE COURT:  Would both lawyers, please, approach the

 9   sidebar?

10            MR. ZOOLE:  Yes, Your Honor.

11            (Bench conference on the record with counsel and the

12   Court:)

13            THE COURT:  Did you guys agree with regard to that

14   tape not being turned on and violating the rules?  What is

15   your understanding about that?

16            MR. LUEPKE:  So what tape are you talking about?

17            THE COURT:  What you agreed to ---

18            MR. ZOOLE:  The patty wagon.

19            THE COURT:  Right.  That it was turned off at some

20   point.

21            MR. ZOOLE:  Yes.

22            THE COURT:  Did I understand you to say that it

23   violated the department rules?

24            MR. ZOOLE:  Right.  And the agreement on record was

25   that no rules come in except those relating to the camera
```

1    coming on and off; that other rules relating to force and

2    things like that would stay out.

3              THE COURT:  Okay.  That's my understanding.  What's

4    yours?

5              MR. LUEPKE:  That is my understanding as well.

6              THE COURT:  Okay, thanks.  Sorry about that.

7         (End of discussion at side bar.)

8              MR. ZOOLE:  And there's a departmental rule that says

9    it's supposed to be on throughout the process and turned --

10   turned on and kept on while anybody's being transported in

11   there.  Even though, minutes later, Mr. Carroll did transport

12   him away from that scene in the patty wagon, the camera's

13   never turned back on again.

14             The tasering we know from the officer's report, they

15   say they did it as part of the arrest process initially.  He

16   began to -- So we have the description of Officer Moton

17   hitting him in the leg with the baton.  And then Officer Moton

18   uses the Taser in the drive stun capacity.  That's with the

19   barbs not attached.  You detach the barbs, and you can just

20   use it like an old-fashioned stun gun to his back for two

21   five-second cycles at which time all resisting ceased and

22   Calvin was handcuffed.  So this is all that we know what

23   they're saying here in the report at 8:21 to 8:26 PM.  We know

24   it was after 8:21, because that's when they radioed in that

25   they were going after him, and before 8:26 because that's when

1    we know the patty wagon arrived.

2          Well, you will also see from Exhibit 13 the company

3    that makes these Tasers has a product called "Evidence Sync."

4    And these records were obtained from the St. Louis City Police

5    Department because they keep these records.  This downloads

6    and puts into memory every time the Taser is used.  This

7    particular Taser, you will see a record of it being used on

8    that date, on March 6th, 2013.  And there's one Taser use at

9    6:40 PM; 18:40.  It's military time is what they're using.

10   And that Taser use is the initial one, well before they came

11   up to Mr. Fletcher.  It's standard before you go on duty.

12   This is about 40 minutes after the shift started.  There's a

13   meeting you go to, the day book, and you test your Taser, and

14   that's what that usage is.

15         There are two more Taser usages on March 6th, 2013:

16   8:52 PM and 8:56 PM; almost a full half hour after

17   Mr. Fletcher has been handcuffed.

18         At this point now, remember, the patty wagon camera

19   had a dashboard camera and it has one on the interior.

20         Mr. Tomlinson says that at some point during this he

21   noticed that Mr. Fletcher had swelling about his face and

22   forehead, and there's a booking photo.  It's kind of hard to

23   see, but you can kind of see later at the jail his eye is --

24   left eye is starting to close up.  It's not a very good

25   picture, but we'll let you see it, and there's a cut you can

1    see above his left eye.

2         The EMTs are dispatched to the scene at 8:53 PM which

3    would be between the two taserings that we show you in that

4    log.  It's still about a good 30 minutes after the arrest.

5    The EMTs, according to Carroll who's running the patty wagon,

6    apparently, to his best memory, just talked to Mr. Fletcher

7    through the mesh cage door.  There's an inner door with mesh

8    cage on it and an outer, more standard van door.  Apparently

9    the outer standard van door was open.  The cage door was

10   closed, and apparently the EMTs shined a flashlight in there.

11   "It looks like he's okay."  Mr. Fletcher, on the EMT's report

12   they say he refused medical treatment.  The signature on

13   the -- on the Refusal of Medical Treatment form isn't

14   Mr. Fletcher's.  It's one of the officers, and they say that's

15   standard procedure when somebody is kind of out of it.

16   According to Mr. Fletcher -- According to Mr. Carroll, the van

17   driver, Mr. Fletcher didn't even respond when he was in the

18   van.  He was, apparently, unconscious at the time.  He says

19   the EMTs asked him if he was okay, and there's no answer.

20   "All right.  We're out of here."

21        The EMT did note something interesting in his report,

22   though.  The EMT typically will always notice it.  And -- And

23   he's a firefighter in the city, so he's seen it plenty of time

24   when somebody looks like they're under the influence of

25   something; alcohol or drugs or acting crazy.  No notation in

1    there at all about that.  There's a big blank; a big, huge

2    section on the EMT form, and we'll show it to you.  I'm

3    running a little low on time so I'm not going to keep putting

4    things on there.  There will be exhibits.

5            ETOH, alcohol, other drug use:  Nothing.  There is a

6    note with respect to his behavior:  Restless.  And we asked

7    him in his deposition, "What do you mean by 'restless'"?

8            "I'm not really sure.  I guess restless.  I don't

9    know."

10           "Well, does that mean he was acting wild or crazy or

11   looked like he was on drugs?"

12           "No.  If he was acting that way, I would have noted

13   that."

14           Nothing like that in the EMT report whatsoever.

15           The patty wagon eventually takes Mr. Fletcher from

16   the scene at 9:12 PM and takes him to the city jail.  They

17   call it "The Justice Center," that jail.  It has an infirmary

18   in it.  He's booked in.  He's booked in to the infirmary.  In

19   there they note a number of wounds and problems all over him,

20   and he stays there in the infirmary at the jail for about five

21   or six days.

22           Now I got to tell you a word about something you're

23   going to hear about, and it relates to Calvin Fletcher's

24   warrants.  At the time he did have warrants out for his

25   arrest.  It was nothing serious.  He had in the city a couple

1    of traffic violations, and he had failed to appear and pay on

2    them.  He had some older charges from Perry County, Missouri;

3    again traffic matters, and he had failed to appear.  It's

4    nothing he's proud of, but he did have warrants out for him.

5    He had been arrested on them before.  He was trying to pay

6    them off which was taking some time, and he had been

7    approached before and arrested before.  Nothing -- No problems

8    ever involved in that.  Nobody had ever roughed him up.  He

9    hadn't claim anybody roughed him up, but that is something on

10   his record, and you're going to see that.  It's not something

11   we're proud of but it's there.

12          There is something else that he's not proud of that

13   you're going to hear about, and that is that also about nine

14   years ago in Tennessee, he ran into some trouble.  He got

15   caught up in a bad check scheme, and he was arrested and

16   charged and convicted.  He pleaded "guilty" to the charge of

17   being involved in the scheme.  The official name of the charge

18   you'll hear is "conspiracy to defraud the United States."  He

19   was sentenced to a year and a day, and he served his time.  He

20   was sentenced to pay restitution.  It was 400 bucks.  He paid

21   it.  He did his sentence and he served his time.  That was

22   nine years ago.  Not anything anybody's proud of but it's a

23   fact, and it's -- we're laying it out for you right now.

24          Now when the infirmary looked at Mr. Fletcher,

25   they -- even though he had swelling and a cut on his head and

1    his eye was starting to close up, they did not for some reason

2    run any sort of head X-ray or CAT scan on him at all.  They

3    gave him some medicine.  They ran a standard chest X-ray to

4    make sure there were no heart problems, I guess, and that was

5    it.  They just kept him in there for about five or six days.

6           He was sent down to Perry County.  There was no

7    report of violence that occurred to him while he was in the

8    infirmary or in the jail at St. Louis City in those five or

9    six days; no report of any violence or attack on him on the

10   way down to Perry County.  Immediately at Perry County, they

11   sent him to the hospital because he looked so bad.  No report

12   of any violence to him there.  He went back and forth from the

13   Perry County Jail to the hospital until he could get his

14   warrants cleared up; another five or six days.  And then on

15   that last day there in Perry County, about 12 days after this

16   event happened, that's when his kidneys got to the point where

17   the man was near death.  And they called for an ambulance

18   because they didn't have the facilities in Perry County to

19   handle it, and they sent him up to St. Louis University

20   Hospital.  And the reason you're going to hear why those

21   kidneys were shut down was because of this beating.  You'll

22   hear that from two different doctors, one who's going to

23   testify to you live and one by deposition.  And you will hear

24   no doctor, nobody with any credentials other than Mr. Luepke

25   who might suggest otherwise.

```
1            The lab report I told you on the item that he
2     allegedly threw out of his pocket was negative.  It wasn't
3     drugs.  The officers charged him with possession of drugs,
4     resisting arrest, and assaulting a police officer because they
5     say he had kicked Mr. Martorano while he was being taken to
6     the van from the patrol car; something that would have been on
7     this video had it not been turned off.  He was charged with
8     those three things.  The St. Louis Prosecutor's Office refused
9     the charges and dismissed them.  They have been dropped.
10           Today, about three years later, I got to tell you
11    Mr. Fletcher is largely recovered from this.  He still
12    occasionally has severe headaches.  He had had some bad ones
13    before this, too, but they're of a different quality
14    afterwards.  They were more severe from the brain bleed that
15    he got.  He had had a cavernous hematoma.  It had existed in
16    his skull before.  It's a condition you're born with, but when
17    you get hard trauma right to it, it bleeds and it causes
18    problems for the rest of your life.  He is at risk and will
19    have problems with those headaches going forward.  He is going
20    to be more susceptible to kidney problems but his kidney
21    problems -- his kidneys are largely functioning fine now he'll
22    tell you.  It's just a risk going forward.
23           The fractures to his face have healed fortunately.
24    They were not just hairline.  They were displaced, but they
25    were only mildly displaced.  A "displaced fracture" means the
```

```
 1    bones are separated out and there's -- there's a gap in some

 2    way.  So it wasn't just a hairline, but at the same time it's

 3    a minor displacement.  And they have healed to Mr. Fletcher's

 4    satisfaction, though you'll see -- he does still have a little

 5    bit of a nose thing going on there, but so do I because I

 6    played rugby in school, so that happens.

 7              You'll see that his kidneys function -- while it's

 8    fine now and does make him susceptible, there are still some

 9    problems, and there are still some medications relating to his

10    overall health problems that he has to take.

11              When this trial is over and you've seen all the

12    evidence -- And we're not just going to have people talk to

13    you.  We're showing you things and will continue to show you

14    things and show you what the testimony is, what the testimony

15    has been in the depositions, what these officers have already

16    sworn to be true.  When that is all over, Mr. Tatlow and I are

17    going to stand back up here before you, and we're going to ask

18    you to try to do some justice in this case because as

19    Mr. Luepke said, nobody yet has reviewed and ruled on these

20    facts.  Nobody has determined anything.  There's been no

21    internal thing.  Nothing's happened yet.  Three years have

22    gone by and nothing's happened.  You will get the chance, and

23    you'll have the responsibility of determining what justice

24    would be in this respect.  We'll ask you to enter a verdict

25    that will be fair and to make sure that this sort of thing
```

 1   doesn't ever happen again or at least discourages it from

 2   happening as much as a jury verdict reasonably can.

 3          Thank you for your time, and I look forward to the

 4   next two to three days with you.

 5          THE COURT:  Counsel for Defendants, would you like to

 6   make an opening statement at this time?

 7          MR. LUEPKE:  I would, Your Honor.

 8          THE COURT:  Go right ahead.

 9          MR. LUEPKE:  The Plaintiff resisted arrest.  And you

10   see, what happens when you resist arrest, the police have to

11   respond to that resistance.  The Plaintiff resisted arrest,

12   and the police responded to that resistance.  And the more the

13   Plaintiff resisted, the more that the police responded.

14          Here's what the evidence is going to show you in this

15   case.  It all happened on March 6th, 2013.

16          On March 6th, 2013, the Plaintiff had a lot of

17   reasons to resist arrest.  Earlier in the day he had been

18   smoking dope.  He then went to a vacant lot that night by

19   himself, and he was carrying on his person what appeared to be

20   a bag of crack cocaine.

21          He had also had multiple warrants out for his arrest;

22   St. Louis City, Perry County.  And he did not want to go back

23   to prison.  He had been in prison before.  He had been in

24   prison for over a year for defrauding the United States

25   Government.  He did not want to go back to prison.

```
 1              And so when he saw a police car drive by and he saw

 2    some police officers get out of that car and ask to speak with

 3    him, they weren't saying he was under arrest.  They just

 4    wanted to speak to Mr. Fletcher.

 5              Mr. Fletcher, he didn't just back -- back away;

 6    "What's happening?"  He ran, and that's undisputed in this

 7    case.  The Plaintiff ran.  And when the Plaintiff ran, the

 8    police responded.  They did their job.  They pursued him.

 9    They ran after him and they caught him.  And when they caught

10    him, Mr. Fletcher resisted arrest.  He continued to resist

11    arrest.  And when he continued to resist, the police

12    responded.

13              He rolled on his stomach.  He was kicking his legs.

14    The police used a baton.  He fought all the harder; resisted

15    all the more.  So, yes, a Taser was used, an electric shock;

16    no prongs, and that worked for a time.  They did -- They were

17    then able to get Mr. Fletcher -- get his hands behind his

18    back, but he continued to fight.  He continued to resist.  And

19    so the police in this case continued to respond, and they put

20    Mr. Fletcher in their police car.

21              Now the Plaintiff wants to suggest, "Oh, and then

22    they hid everything; they covered it up."  Just the opposite

23    happened.

24              They called their superior officer, Officer

25    Christopher Simeone.  Christopher Simeone is not a defendant
```

1    in this case.  Sergeant Simeone is not being sued.  He has no

2    stake in this case, and he will tell you the truth.  He will

3    come into this courtroom and he'll tell you exactly what he

4    saw.

5         And what he saw was:  He came to the scene, and first

6    he talked to these officers.  "What's going on here, guys?"

7         "Well, we have this suspect.  Wanted to talk to him.

8    He resisted arrest.  We put him in handcuffs.  He's now in the

9    police car."

10        "Okay.  Now I'm going to go over and talk to the

11   suspect and see what he has to tell me."  Christopher Simeone,

12   Sergeant Simeone then went over to the police car to talk to

13   the Plaintiff to get his side of the story that night, but

14   what he saw was a police car that was rocking back and forth.

15        "Excuse me, Mr. Fletcher.  Can I -- Can I speak with

16   you?"

17        "Rahhhhhhh!"  He was going nuts inside the police

18   car.  That's what a third-party Sergeant of the police force

19   will tell you.

20        There was no taking this suspect in.  A -- What was

21   called a "patty wagon," a police van, was called.  They

22   couldn't take him in the -- in the patrol car.  They had to

23   get the patty wagon.

24        The patty wagon came.  They moved Mr. Fletcher over

25   into the patty wagon.  Still resisting; still fighting.  He

```
 1    rocked up his head.  He knocked up his own head against the
 2    inside of the patty wagon, of the police van.
 3         The police responded to that.  How did they respond?
 4    Did they hide it?  Did they cover it up?  Did they beat him?
 5    No.  Just like they called Sergeant Simeone, they called
 6    paramedics.  They called paramedics to come to the scene.
 7         "We have a suspect who's going crazy.  He's fighting.
 8    He's resisting."
 9         Another third-party witness; the paramedics aren't
10    being sued in this case.  They came to the scene, and they
11    will come to court and they will tell you exactly what they
12    saw.  And what they saw was a plaintiff who was resisting
13    arrest, a plaintiff who they spoke with.  And you know what?
14    They did put a bandage on his head.  He was treated.
15         And they specifically asked Mr. Fletcher,
16    "Mr. Fletcher, do you need to go to a hospital?"
17         And the answer was, "No, I don't need to go to the
18    hospital.  I'm not hurt."
19         Okay.  When we asked Mr. Fletcher about it, we said,
20    "Do you remember speaking with paramedics?"
21         He said he doesn't even remember speaking to
22    paramedics.  We will hear from the paramedics that were at the
23    scene.
24         The police rules are:  In the case of resisting an
25    arrest, you arrest them, and then the arresting officers are
```

1     off the case; no more.

2            The paramedics looked at Mr. Fletcher.  He was taken

3     in the cruiser, taken to the Police Station, and he was -- he

4     was booked on charges.  These officers, their job was done.

5     They went to the -- They went to take what they thought were

6     the drugs to the laboratory.  It's correct it turned out they

7     were not controlled substances, but they did appear to be

8     drugs, which is itself a crime, and they then filled out the

9     report.

10            This is key.  They filled out the report that night

11    as it happened before they ever had any idea that they would

12    later be sued; that they would ever later be questioned.

13    What's in that report is what happened.

14            So during this case you're going to asked to be, as

15    the Judge -- as the Court indicated, to judge credibility.

16            "Boy, their cops are saying one thing; Plaintiff is

17    saying another.  How do we -- How do we decide?"

18            Here's what the evidence is going to show you.  The

19    police wrote it down; reported it that night.  It was reviewed

20    by their superior officers, continually reviewed, and they

21    went home to be with their families.

22            The Plaintiff didn't bring this suit until over a

23    year later.

24            "Oh, yeah, I think maybe this is what happened.

25    Yeah, that must have been it."

1        The Plaintiff has been convicted of defrauding the

2   United States Government.  He smokes dope.  You'll be asked:

3   Who do you believe?

4        But here's what the evidence is going to show you in

5   this case.  What happened to Calvin Fletcher was brought about

6   by Calvin Fletcher.  He lied to the Government.  He smoked

7   dope.  He fled police.  He resisted arrest, and the police

8   responded to that resistance as they are expected to do.  They

9   perform their job.  We ask that your verdict rule accordingly.

10       Thank you.

11       THE COURT:  Members of the Jury, the counsel for both

12  sides have given me a joint statement of facts that's been

13  stipulated to, and I have to read them to you at this time.

14       The Plaintiff and the Defendants have stipulated --

15  that is, they have agreed -- that certain facts are as counsel

16  have just stated.  You should, therefore, treat those facts as

17  having been proved.

18       On the evening of March the 6th, 2013, St. Louis City

19  Police Officers Joseph Tomlinson, Nicholas Martorano, and

20  John Moton were on duty in a marked patrol car near the

21  intersection of 13th and Cass Streets in St. Louis, Missouri,

22  when they saw Calvin Fletcher.  Calvin Fletcher was walking

23  toward a gas station at or near that intersection at the time.

24       One or more of the police officers got out of the

25  patrol car, approached Mr. Fletcher, and eventually handcuffed

1   him.

2   The parties dispute the specific events that went on

3   immediately leading up to, during and immediately after that

4   handcuffing.

5   Two or more of the police officers then took

6   Mr. Fletcher to the patrol car and put him inside of it.  A

7   patty wagon, sometimes called a "cruiser," driven by St. Louis

8   Police Officer Jonathan Carroll was called and arrived at the

9   scene.  Mr. Fletcher was placed inside the patty wagon.

10  Officer Carroll drove Mr. Fletcher from the scene to the city

11  jail.

12  Mr. Fletcher was then booked on charges of assault,

13  resisting arrest and possession of a controlled substance.

14  Those charges have been dropped and dismissed.  At the time of

15  the arrest, the four individual Defendants in this case were

16  acting under the color of state law.

17  You may call your first witness.

18  MR. ZOOLE:  Your Honor, before calling the first

19  witness, may I briefly approach?

20  THE COURT:  Come up.

21  MR. ZOOLE:  Thank you.

22  (Bench conference on the record with counsel and the

23  Court:)

24  MR. ZOOLE:  The ruling on drug use was just for that

25  day.  The statement was, "He smokes dope," implying

```
 1    regularity.  I'm not moving for mistrial.  I'm not moving for

 2    sanctions or instructions, but that's strike one.

 3              THE COURT:  Look, it was for drug use for that day.

 4              MR. LUEPKE:  That's right.

 5              THE COURT:  I just think when you said he was

 6    doping, ---

 7              MR. LUEPKE:  I didn't say that.  I said he smoked

 8    dope.

 9              MR. ZOOLE:  No, you didn't say he smoked dope.  You

10    said "smokes dope."

11              MR. LUEPKE:  He does smoke dope.

12              THE COURT:  Hold on.  Hold on.  It came close, but I

13    don't think it gets to the point where it completely violates

14    my ruling.  So if you make reference to it again, please make

15    sure that you're referencing --

16              MR. LUEPKE:  I will.

17              THE COURT:  -- he smoked that day.

18              MR. LUEPKE:  But I was very careful.  I'm offended by

19    that.  Strike one for you.

20              MR. ZOOLE:  Read the transcript.

21              THE COURT:  Hey, look, gentlemen, come here!  Come

22    here!  This is not a very long trial.  We're not going to get

23    personal.  You know, keep it civil and let's get this case

24    tried.  So let's cut out all these personal remarks --

25              MR. LUEPKE:  I apologize, Your Honor.
```

```
 1                THE COURT:  -- and just try the case.

 2                MR. ZOOLE:  Fair enough.  Thanks, Judge.

 3           (End of discussion at side bar.)

 4                MR. TATLOW:  I need to step out to get our witness,

 5      Your Honor.

 6                THE COURT:  Okay.

 7                MR. TATLOW:  He's right outside.

 8                THE COURT:  Okay.

 9                MR. TATLOW:  The Plaintiff calls Dr. Steven Arkin to

10      the stand.

11                THE COURT:  Okay.

12           (The Witness, STEVEN ARKIN, M.D., Is Sworn.)

13                THE COURT:  You may proceed.

14                MR. TATLOW:  Thank you, Your Honor.

15                        DIRECT EXAMINATION

16      QUESTIONS BY MR. TATLOW:

17      Q    Good afternoon, Dr. Arkin.  Thank you for being here

18      today.

19      A    Thank you.

20      Q    And where are you from, sir?

21      A    I'm from Overland Park, Kansas; a suburb of Kansas City.

22      Q    Okay, great.  I hope you didn't have too long of a drive.

23      A    No.

24      Q    Thank you.  And, Dr. Arkin, what type of a doctor are

25      you, sir?
```

```
 1   A    I'm a neurologist.

 2   Q    A neurologist.  Does that also mean you're a Medical

 3   Doctor?

 4   A    Yes.

 5   Q    And are you here on behalf of the Plaintiff's request,

 6   mine and Mr. Zoole's request?

 7   A    Yes.

 8   Q    And what purpose did you get involved on this case for to

 9   begin with?

10   A    I was asked to review the information in the case about a

11   year and a half ago.

12   Q    All right.  And was that purpose to do an independent

13   exam and a consultation with Mr. Fletcher and form some

14   opinions and conclusions about the case?

15   A    It was.

16   Q    All right.  Before I get to that, I'd like to ask a

17   little bit about your credentials.  Can you, please, tell the

18   jury where you did your medical training?

19   A    I did medical school in Chicago at Rush University.  That

20   is in the middle of Chicago.  And then I did my internship at

21   Northwestern in Evanston, Illinois, and my residency and

22   fellowship in the University of Iowa in Iowa City.

23   Q    And I think you mentioned you are a neurologist.  Is that

24   correct?

25   A    Correct.
```

```
 1    Q      What is a "neurologist"?

 2    A      A neurologist is somebody that studies the brain and the

 3    spinal cord and the nervous system.

 4    Q      All right.  And did you have to take special training for

 5    that, Dr. Arkin?

 6    A      I trained at the University of Iowa in a program there in

 7    in Neurology.

 8    Q      In addition to that, what was your general medical degree

 9    in and your internship?

10    A      Medical degree is an M.D. Degree, and my internship is a

11    first year of Internal Medicine.  That was done at

12    Northwestern.

13    Q      Okay.  As part of that degree and your studying at

14    Northwestern, did you study all parts of the body?  Just --

15    Not just the brain?

16    A      Correct.

17    Q      And as part of your regular practice, are you a

18    practicing physician in the Kansas City area?

19    A      I am.

20    Q      What hospital or hospitals do you practice at?

21    A      We have four hospitals.  That's the St. Luke's Hospital

22    system, and there is a hospital right in the middle in the

23    Plaza, and then there are three hospitals in the outskirts, in

24    the suburbs.

25    Q      Do you see patients that are hospitalized for trauma for
```

```
 1   injuries?  Automobile accidents?
 2   A    Yes, I do.
 3   Q    And do you regularly examine the brain or the effects of
 4   brain injuries on these patients?
 5   A    Yes.
 6   Q    And as part of that practice over the years, have you
 7   also developed a Neurology practice in Kansas City?
 8   A    I have.
 9   Q    And do you see private patients as well?
10   A    I do.  I see private patients in the office, and I see
11   anybody who comes into the hospital either through the
12   Emergency Room or transferred in from other hospitals.
13   Q    Have you had the opportunity in your private practice in
14   the hospital setting to also examine the neurological effects
15   of kidney injuries from trauma?
16   A    Right.  I do treat people that have other metabolic
17   problems or other infectious disease problems that would
18   affect the brain.
19   Q    Okay.  Very well, Dr. Arkin.  As part of your review
20   process, do you have a recollection or a record of the medical
21   records from this case and information you reviewed?
22   A    Yes, I do.
23   Q    Can you briefly describe that for the jury?
24   A    I reviewed the records from the St. Louis Justice Center
25   as well as Perry County Hospital as well as St. Louis
```

1    University and Barnes.

2    Q    Have you also spoken with Mr. Fletcher about this

3    incident?

4    A    I have.

5    Q    And have you spoken to him about his medical condition?

6    A    I have.

7    Q    Let me just ask you, Dr. Arkin:  Based upon the records

8    that you reviewed and the history that was given, what's your

9    understanding of the incident on March 7th, 2013, as to the

10   injuries Mr. Fletcher suffered?

11   A    My knowledge of it is that there was injuries to multiple

12   areas in Mr. Fletcher's body.  My primary concern as a

13   neurologist would be the head, but also there are other areas

14   that were involved that secondarily affected the brain due to

15   metabolic factors.

16   Q    And I believe I misstated.  The injury date we allege is

17   actually 3-6-13 on the date of the altercation with these

18   officers.  Would that be correct?

19   A    Correct.

20   Q    And so you mentioned a certain -- a few body parts.  Can

21   you break those down individually?

22        You were speaking a little fast.  I want to make sure

23   I get them all.

24   A    There were injuries to the head and face as well as to

25   the torso and back and ribs, and there were injuries to the

1    knees as well as the wrists and the left great toe.

2    Q    Okay.  Can you break that down and tell us what sort of

3    injury, based on a reasonable degree of medical certainty, did

4    Mr. Fletcher have as a result of this altercation with the

5    police officers?

6         MR. LUEPKE:  Your Honor, I'm going to object.  Can we

7    approach?

8         THE COURT:  You may.

9         (Bench conference on the record with counsel and the

10   Court:)

11        MR. LUEPKE:  This witness is not qualified to testify

12   to causation.  He didn't see this -- his patient until two

13   years after.  He can talk about what injuries, what he

14   observed, but he can't say that it was a result of what

15   happened with the police.

16        THE COURT:  I mean you're going to get a chance to

17   cross-examine -- cross-examine him about the very fact that

18   you're bringing up up here, and then it's up to the jury to

19   believe whether or not he's breached causation.  He can review

20   the reports and give an expert testimony.  Experts don't

21   usually have an opportunity during the time of the injuries,

22   but I'll let Mr. Tatlow speak to this.

23        MR. TATLOW:  Thank you, Your Honor.

24        (End of discussion at side bar.)

25   Q    (By Mr. Tatlow)  Now, Dr. Arkin, as part of your

1   neurological practice and your practice in Kansas City at the

2   hospitals, is it common for you to review charts of patients

3   and render an opinion on the causation of certain injuries?

4   A    Yes, it is.

5   Q    And is it sometimes not possible to see them immediately,

6   where you may be called in as a consultant a year or years

7   later, and give an opinion on the cause of those injuries?

8   A    That's correct.

9   Q    And in this case were you asked to review the medical

10  records and the conditions of Mr. Fletcher and all that took

11  place based on the history and give your opinion on the cause

12  of Mr. Fletcher's injuries?

13  A    That's correct.

14  Q    After reviewing the medical records and the incidents

15  that took place, in talking with Mr. Fletcher, did you form an

16  opinion, based on reasonable medical certainty, as to the

17  specific injuries Mr. Fletcher suffered in the altercation

18  with these officers?

19  A    Yes, I did.

20  Q    And what is that opinion, sir?

21  A    My opinion is that based on the changes in his face in

22  the records with the fractures as well as bruising in and

23  around the face and left eye and below the left eye and that

24  he had injury to the back, that there were two specific

25  injuries that were helpful to me; that he did sustain an

1    injury to the face and head and subsequently the brain, and

2    that, secondarily, he had metabolic injury as seen by the

3    records based on the trauma to his back and torso that caused

4    secondary injury to the brain.

5    Q    Thank you.  And I wanted to break that down on the face.

6    You mentioned that he had facial fractures.  Is that correct?

7    A    That's correct.

8    Q    And if you have any notes or any documents with you, do

9    you have -- Did you actually prepare a report in preparation

10   for trial of this case?

11   A    I did.

12   Q    And did you prepare a report that you used prior to a

13   deposition you gave in this case?

14   A    That's correct.

15   Q    Can you tell us what parts of the face that he fractured,

16   Dr. Arkin?

17   A    The fracture was just below the eye on the left side.

18   It's called the "zygomatic arch," and it is located just below

19   the socket of the eye, and that the bruising was right around

20   the eye itself and then across the forehead.

21   Q    All right.  So that fracture, did that extend across the

22   left eye and the left cheek?  Is that what you're pointing to?

23   A    Correct.  The fracture was right here and extended out

24   towards the temporal bone.

25   Q    Would that be consistent with a hard strike to the left

1   portion of the face by a hard object?

2   A    Yes, it would.

3   Q    Do you have an opinion whether or not that injury was

4   caused by a strike to his face by the officers based on the

5   history and the records you've reviewed?

6   A    Based on the history, I believe that that was the case.

7   Q    All right.  And then you mentioned secondarily, I

8   believe, there was also a brain injury.  Is that correct?

9   A    I mentioned that there was secondary brain injury to the

10  skull being impacted by the fracture.  And underneath the

11  skull is the temporal lobe which is consistent with some of

12  the injuries that I discovered reading the record as well as

13  in talking to Mr. Fletcher.

14  Q    How can a traumatic injury to the front of the face also

15  damage the brain, Dr. Arkin?

16  A    What happens is that if there is a blunt force, that the

17  skull then goes on top of the brain itself.  And in this case

18  it's along the temporal area which it controls thinking and

19  behavior.

20  Q    And I'm not familiar with that temporal area.  What does

21  that mean, Dr. Arkin?

22  A    There are several lobes of the brain.  There's the

23  frontal region.  There's the temporal region, the parietal

24  region and the occipital, and each of those regions control

25  various aspects of the body in terms of motor function,

1    sensory function, thinking and learning as well as behavior

2    and vision.

3    Q    Also, I believe it was mentioned earlier, and you may not

4    have been in here, but there was a cavernoma to Mr. Fletcher

5    that he had.  Did you recall that from reading the records?

6    A    I do recall that.

7    Q    What is a "cavernoma"?

8    A    A cavernoma is a larger vein, so that it is -- can

9    actually be seen on a scan.  And basically when the artery or

10   the vein is a little bit larger, it can be a little more

11   brittle and it can leak.

12   Q    And how often -- When you say it can leak, do you mean

13   leak fluid or blood or what do you mean?

14   A    It would be leaking blood.

15   Q    Did you see evidence of Mr. Fletcher having leakage of

16   blood in the cavernoma area of his brain?

17   A    Based on the records from that timeframe is that there

18   was leakage of blood as seen on the CT scan.  The blood is

19   present, and then it goes away.  And subsequently they did an

20   MRI which showed the cavernoma itself.

21   Q    I see.  And let me just break that down a little.  So

22   there's a cavernoma in the brain, and it can cause -- it can

23   leak or have bleeding.  Is that correct?

24   A    That's correct.

25   Q    What type of force, in your opinion, based upon all of

1    your practice in the neurological clinic and hospital, does it

2    take to cause bleeding of the brain like that?

3    A    The cavernoma is under a very low amount of pressure.

4    It's not like an aneurysm.  An aneurysm can readily bleed.  So

5    a cavernoma generally does not bleed at all your entire

6    lifetime, so it takes a significant amount of force to cause

7    that leakage of blood.

8    Q    Mr. Fletcher will testify that the officers slammed the

9    door of the van on his head, the patty wagon, if you will.

10   Can force like that cause a brain to be injured and the brain

11   to bleed?

12   A    Yes, it can.

13   Q    Can that cause fractures like you saw?

14   A    Yes, it can.

15   Q    With the consistency of the fractures of the face, the

16   zygomatic fracture, the nose the way you described it, and the

17   brain injury, do you believe that one or more of the events

18   that night caused the fractures and the brain injury?

19   A    I believe so.

20   Q    Okay.  Can you tell us whether it was the combination of

21   several forces or just one or more of the forces?

22   A    I think I would have to say one or more.  There could be

23   one force in that location that could have caused a direct

24   injury to cause the fractures as well as the bruising around

25   the eye in that location.  And then what happens is that there

1    can be a counterforce.  You have the skull all the way around,

2    and then on the back you can have the brain being accelerated

3    back, towards the back part of the brain, and that can cause

4    the bleed itself.

5    Q    All right.  And you could actually see that on diagnostic

6    studies that were taken?

7    A    Yes.

8    Q    And those studies were available, the reports, for you to

9    review a couple of years after the accident, correct?

10   A    That's correct.

11   Q    And were those part of some of the hospital records you

12   reviewed?

13   A    It was.

14   Q    Okay.  I'd like to get to that in a moment.  But, first,

15   I'd like to -- I'd like to ask if you read the Corizon

16   Medical; the St. Louis Correctional records.  Is that correct?

17   A    I have.

18   Q    Okay.  I'd like to know if there was anything important

19   to your opinions that you noted about injuries that he

20   suffered immediately after he was brought to The Justice

21   Center.

22   A    It was noted that he had a large contusion on the left

23   forehead and around the eye and swelling on the left side of

24   the face and below the eye with bruising and that he had

25   abrasions, which are these cuts and scratches, across the

```
 1    forehead as well as the elbow and wrists and that there was a

 2    linear, in a line, lesion that was on his back.

 3    Q    Now I heard that mentioned earlier, too, and I saw it in

 4    some medical records, but what is a "linear" wound, Dr. Arkin?

 5    A    "Linear" means that it's in a line, and that is generally

 6    a narrow line that covers some distance.

 7    Q    Okay.  And what type of objects can cause a linear wound?

 8    A    It would be a linear object.  So it would be like a baton

 9    or a rod of some sort.

10    Q    Okay.  And to what body part were the linear bruises

11    found?

12    A    That was found on the back.

13    Q    Now did that occur directly after he was brought to the

14    infirmary by the officers?

15    A    That was noted by the professionals that were at The

16    Justice Center.

17    Q    Okay.  So the linear bruising area, was that -- what part

18    of the back was that to?

19    A    That was -- To my understanding, it was along the back

20    side.  They didn't specify directly.

21    Q    Okay.  Now let me just ask you a little bit about

22    anatomy.  Where are the kidneys located in the body?

23    A    They're located down in the torso near where that injury

24    was.

25    Q    That was the same general area where the linear or line
```

1   bruising was?

2   A    Correct.

3   Q    Did you follow and review the nurse's notes throughout

4   his course of stay at The Justice Center?

5   A    I have.

6   Q    And what other problems was he having when he was at The

7   Justice Center that you noted or found important?

8   A    Well, he was found to be rather anxious and depressed and

9   that he wasn't being very active.  Those are the things I

10  gleaned.

11  Q    Okay.  Was he given medication for his pain?

12  A    He was.

13  Q    What type of medication was he administered?

14  A    He was given Norco and Tylenol.

15  Q    All right.  And as part of Plaintiff's Exhibit 1, I would

16  like to put this up on the Elmo for your review.

17       MR. TATLOW:  Can everyone see that on the jury box?

18  Q    (By Mr. Tatlow)  This was 3-7-13.  Is that correct?

19  A    Correct.

20  Q    That's the day after he was brought to The Justice

21  Center.  Is that correct?

22  A    Yes.

23  Q    And his musculoskeletal exam, where did that show the

24  bruising and scrapes?

25  A    It says to the body, and it says that there were bruises

1    and scrapes to the body.

2    Q    And what's checked there?  "Abnormal"?

3    A    Correct; that there were -- that was an abnormal

4    examination.

5    Q    And what did the nurse note about the skin of his body?

6    A    That it was abnormal and, again, represented that there

7    were bruises and scrapes.

8    Q    All right.  And then I'd like to show you Page 2 of that

9    same exhibit and ask:  What, if anything, is noted about his

10   wounds and his pain level at that time?

11   A    It was noted that there were wounds at multiple sites and

12   that the pain was described as all over.  And on a level of

13   zero to ten, it was in the five to six range.

14   Q    Thank you.  As time went on at The Justice Center, there

15   was another nursing note dated March 8 of 2013.  Were there

16   changes in his musculoskeletal situation at that time?

17   A    They stated at that time the gait was limping and that he

18   was in bed.

19   Q    Okay.  And then in the center, "WC," does that stand for

20   "wheelchair in use"?

21   A    Yes.  That's our classic determination of a wheelchair.

22   Q    Okay.  So he went from having moderate pain to having to

23   need a wheelchair and having a limping gait.  Is that correct?

24   A    That's correct.

25   Q    Is it often common for the condition of the body to get

1    worse over time after an assault or a traumatic injury?

2    A    What happens is that you have the initial insult and then

3    you can have swelling around the areas that are involved, and

4    that swelling can lead to changes where there's less room for

5    the nerves to travel.  When that happens, there's more pain in

6    the body, and you require more help in terms of getting

7    around.

8    Q    Was there anything significant under "Genital or Urinary"

9    that you noted that the nurses put on their chart?

10   A    It said that -- It looks like it said that it was

11   difficult to drink fluids.

12   Q    Okay.  As time went on -- I won't go through every note

13   with you, but 3-9, were there changes regarding his genital or

14   urinary condition?

15   A    There's a question mark by "Urination," and I took that

16   to mean that he was having trouble urinating.

17   Q    Okay.  Any significance to that at this point?

18   A    To me as a general physician, that means that if someone

19   has difficulty urinating, that means that there's some problem

20   within the kidney itself.

21   Q    All right.  And then down below they note the multiple

22   skin lacerations.  Anything else important to you?

23   A    They mention again abnormalities along the back and the

24   left side and contusion which is a bruise.

25   Q    By the way, is a "contusion" a bruise, Doctor?

1    A    That's correct.

2    Q    All right.  The next entry is Page 2 of that document,

3    and what's it say about the wounds there?

4    A    It says that there's multiple road rash all over the body

5    and that there is healing of some of those areas.

6    Q    All right.  3-10 is the next date.  I have Page 1.  I'm

7    going to move through this quickly.  I just wanted to show

8    that to you.  Then Page 2 of 3-10.  I want to tell you if

9    anything else is -- Pardon me.  Has anything else changed on

10   3-10 to his body?  Anything different?

11   A    Well, now he's reporting some pain with the urination

12   which I think is important.

13   Q    Why is that important?

14   A    That's a measure of kidney injury itself.

15   Q    All right.  And under "Pain" where it says location,

16   where is that?

17   A    They mentioned that it was kidney pain.

18   Q    And it says that the pain is noted on all the shifts.  Is

19   that correct?

20   A    That's correct.

21   Q    And then on the night shift, it goes up, doesn't it?

22   A    It does.

23   Q    Is there some significance to that to you in your doctor

24   opinion?

25   A    To me, it means that he has less -- Well, he has more

1    pain; that it's reached a 10/10 level which is the largest

2    number on our scale.

3    Q    Thank you.  And finally, on 3-11, let's look at that

4    entry, Doctor.  How's he doing musculoskeletal-wise with his

5    condition at that point?

6    A    Well, it looks to me like he's slowing down; that they

7    make reference to a weakness and to his gait being slow.

8    Q    All right.  And then down below, his skin, is it still

9    noted that he had these problems?

10   A    Still noted that he has the abrasions, which is the cuts

11   and scrapes, on his face and arms and knees.

12   Q    Thank you.  After that, it's my understanding that

13   Mr. Fletcher was released and all charges were dropped, and he

14   was then transported to Perry County.  Is that your

15   understanding?

16   A    That is.

17   Q    Let's talk about that.  And you reviewed the records of

18   Perry County.  Is that correct?

19   A    I did.

20   Q    And what records did you review from Perry County?

21   A    There were records from an Emergency Room visit on 3-12

22   as well as an Emergency Room visit on 3-19.

23   Q    The visit on 3-12, what was that for, Dr. Arkin?

24   A    The visit there, to my understanding, was that he was

25   being transferred to another correctional facility and that it

1    was noted what kind of condition he was in.  So he was brought

2    inside to the hospital and that he was going to the jail

3    initially but then was diverted.

4    Q     Was a description taken of his injuries or his complaints

5    that you noted?

6    A     It was.

7    Q     Tell us about that.

8    A     He had a 1.5 centimeter, which is about two-thirds of an

9    inch, laceration, a cut, across the forehead and that he was

10   having pain in his back, his hip and his knees as well as his

11   flank.

12   Q     Did you see any references prior to that of any trauma

13   occurring after he was involved with these police officers

14   before this Perry County entry?

15   A     There was no indication.

16   Q     Would you have expected there to be if something else had

17   happened to him?

18   A     I would.

19   Q     And do you have an opinion, based on the history and the

20   records, whether the entries from Perry County were due to the

21   assault with the police officers?

22   A     I believe they were with the original injury.

23   Q     All right.  And how was he doing other than that?  Was

24   there anything else notable on 3-12 that you noticed?

25   A     That he was still having his pain in the ribs as well as

1    the wrists and the head and that subsequently they did a CT

2    scan which showed the area of abnormality on the back part of

3    his head, which is called the "cerebellum," consistent with

4    his cavernoma.

5    Q    Let me stop you a minute there, Doctor.  And as part of

6    the chart, I'd like to pull out the CT scan on 3-2-13 and show

7    that to you.  Would you tell the jury what a "CT scan" is?

8    A    A "CT" is "computed tomography."  So it's more than just

9    a regular skull film.  It actually is a computer-generated

10   look at the brain itself.

11   Q    And what's the purpose of doing that?

12   A    Generally, the purpose of doing a CT after injury is to

13   see if there is any hemorrhage, if there is any contusion or

14   blood within the brain itself.

15   Q    Do you do that in the absence of assaults or absence of

16   trauma to the brain or is it normally done with some sort of a

17   trauma?

18   A    There are a number of reasons to have a CT scan.

19   Generally, the most common is actually to see if somebody's

20   had a stroke or not or had a bleed with stroke symptoms.  It

21   also can be used if somebody is thought to have a brain tumor

22   and/or they have some type of infection.

23   Q    What did the doctor from Perry County think where he

24   listed the history?

25   A    He elicited a history as assault with head injury.

1    Q     So would you believe that the reason for the CT scan of

2    the brain was this assault, not something else?

3    A     That was what was asked of the radiologist in terms of

4    review.

5    Q     Okay.  And under "Summary," what were the findings that

6    were made?

7    A     There was a one-centimeter hyper-dense lesion in the left

8    cerebellum and considerable calcification or hematoma, and

9    recommendation of an MRI.  Also was seen this left zygomatic

10   arch fracture.

11   Q     Again, what's a "zygomatic arch"?

12   A     That's the area of the cheekbone right below the eye.

13   Q     Okay.  And what does that mean, "indeterminate

14   one-centimeter hyper-dense lesion"?  I can hardly say it, but

15   can you tell us what that means?

16   A     On a CT scan you can have dark areas, gray areas and

17   white areas.  So when you talk about a hyper-dense area,

18   that's a white area.  In general, it could mean one of two

19   majors things.  One is a calcification, calcium causing

20   problems within the blood vessels of the brain, or it could be

21   hemorrhage which is blood.  And that is actually the most

22   common way that we see this type of lesion.

23   Q     Were there any other tests that were taken that help you

24   determine whether that was a calcification or from bleeding?

25   A     Well, the next test that was done that proved that it was

 1   a blood -- well, bleeding instead of calcification is the next

 2   CT scan which was done on the 19th.

 3   Q    If you'll give me a minute, I'll try to find that, Doc.

 4   So why don't you tell us.  That was done on 3-19.  Is that

 5   correct?

 6   A    That's correct.

 7   Q    And what did the 3-19 test reveal to you?

 8   A    So the 3-19 test showed that the calcification or the

 9   lesion had disappeared.  And what that means is that the

10   blood, after a period of time, generally within about seven

11   days, will go from a bright spot to a gray spot, eventually to

12   a black spot.

13   Q    All right.  And I found it here for you to look at.  Is

14   this the CT scan of the brain taken on 3-19-13 right here?

15   A    That's correct.

16   Q    And you can point at that.  You can mark on it.  You can

17   do what you want with it, but would you -- Let me change the

18   color.  That yellow is hard to see there.  Why don't you show

19   us where -- What shows you that it had changed in some manner,

20   Doctor?

21   A    So I'm looking at No. 2 under the "Conclusions" that says

22   that the one-centimeter hemorrhage noted in the left

23   cerebellum on 3-12 had resolved.

24   Q    And how does that tell you that the brain was bleeding

25   when you compare the two CT scans?

```
 1    A    If it had been a calcification, it would have still been

 2    a bright spot.

 3    Q    Okay.  And then, again, they talk about the arch fracture

 4    here, don't they?

 5    A    They do.

 6    Q    And that wasn't any different, correct?

 7    A    That was unchanged.

 8    Q    Okay.  So can you tell by those two CT scans that this

 9    was a traumatic brain injury when you compare the trauma that

10    was reported and all the records, the history of the head

11    injury, the assault with the police, and these two different

12    CT scans?

13    A    Yes, I can.

14    Q    What is your opinion on that, Dr. Arkin?

15    A    My opinion is that the assault led to the hemorrhage in

16    the back part of the brain that did resolve and that it did

17    result in the fracture of the cheekbone just below the eye.

18    Q    All right.  And then I'd like to ask you about this,

19    Dr. Arkin:  I notice that there were a bunch of blood tests

20    taken at Perry County.  Is that correct?

21    A    That's correct.

22    Q    And what's the purpose of taking these blood tests?

23    A    The blood tests were to try to figure out what had

24    happened to Mr. Fletcher when he was in the jail leading up to

25    the Emergency Room visit on 3-19.  He was experiencing fatigue
```

1   and some type of event, a convulsion, and they were trying to

2   figure out what led to that.

3   Q    So he was actually having convulsions at Perry County?

4   A    By the representation in the record, I think at the jail

5   it looked like he was having some type of event where he

6   was -- lost awareness and responsiveness and was shaking.

7   Q    Did you have a chance to review the blood tests, Doctor?

8   A    I did.

9   Q    I'd like to show you one of the pages of the blood tests.

10  And you've read them all, haven't you?

11  A    I have.

12  Q    And I'd like to put this up here.  Let me see if I can

13  undo this real quick.  There.  Is this the last page of the

14  blood tests you reviewed?

15  A    That's correct.

16  Q    And when -- It says "Basic Metabolic Profile" up here,

17  right?

18  A    Yes, it does.

19  Q    What's that mean in laymen's terms?

20  A    A "Basic Metabolic Profile" is looking at the most

21  important electrolytes.  So we look at things like sodium and

22  potassium.  We also look at some of the fluid balance and what

23  the kidney function is.  So realistically it's the things that

24  can go wrong that are fairly easy fixable.

25  Q    Why would these Perry County docs care about a blood test

```
 1   or these functions when what he had was a brain injury,

 2   fractures to the face and abrasions on the body?  Why does it

 3   matter about the kidneys?

 4   A    Well, he had a spell that ---

 5         MR. LUEPKE:  Object, Your Honor; no foundation to say

 6   why other people would do what they did.

 7         THE COURT:  Overruled.  You'll have a chance to

 8   cross-examine.

 9         Mr. Tatlow, do you have much longer with this

10   witness?

11         MR. TATLOW:  No, Your Honor.

12         THE COURT:  Okay.  Go right ahead.

13         MR. TATLOW:  I -- I could finish up the Perry County

14   part quickly and then there will be another session of SLU's.

15   Maybe that would be a ---

16         THE COURT:  Appropriate time to break, all right.

17   Q    (By Mr. Tatlow)  Why would they care about checking the

18   kidneys when he's there for a brain injury and fractures about

19   the face and abrasions on the body?

20   A    Well, he also had a convulsive episode or they thought

21   that he did, and one of the considerations is that there were

22   changes within the sodium levels or potassium with the kidney

23   function.

24   Q    Can you tell us by looking at this document, the Basic

25   Metabolic Profile, what conditions were significant to you in
```

1    your opinion?

2    A    The main thing that comes out to me is that his

3    creatinine level, which is right here, was 27.6 and actually

4    an early blood work was 28.4, and that's representative of

5    severe kidney failure.

6    Q    Did you have the opportunity to review any blood tests of

7    Mr. Fletcher that were from before this whole assault?

8    A    Yes, I did.

9    Q    And when was that or what was the date of that?  What

10   year?

11   A    In 2012 he had a creatinine level of 1.0.

12   Q    What's the difference between a 1.0 of creatinine and

13   27.6?

14   A    The normal level of creatinine can go up to about 1.2 and

15   that the level of 27.6 is extremely high.

16   Q    And when it's extremely high, is there some significance

17   to that?  I don't quite understand that.

18   A    What happens there is that there's a build-up of toxins.

19   If the kidney cannot clear the toxins, then it is very

20   difficult to respond to things.

21   Q    And was his condition better, worse, the same as when he

22   had been at Corizon at the EMS Center?  The Justice Center?

23   A    His condition had worsened.

24   Q    And how had it worsened from a kidney perspective?

25   A    What had worsened from a kidney perspective is that he

1    was unable to clear these toxins, and that led to his

2    diminished responsiveness.

3    Q    Okay.  And is that at a dangerous level, Doc?

4    A    That's a level that extremely high that requires

5    dialysis.

6    Q    And what if someone doesn't have dialysis and they have

7    that level of creatinine?

8    A    That build-up will eventually cause enough problems with

9    the potassium that they would then have a heart attack and

10   rhythm problems and die.

11   Q    All right.  So he was at a situation that was dire.  He

12   was about to die at that time?

13   A    I believe so.

14   Q    And so based upon the 27.6 and the earlier one that was

15   around a 1 or a little over a 1, do you have an opinion to a

16   reasonable degree of medical certainty what caused the blood

17   and the creatinine to go so high, Doctor?

18   A    My opinion is that it was the trauma to the torso, to the

19   back, which caused kidney failure.

20   Q    The trauma with these officers?

21   A    Correct.

22   Q    Not some other trauma.

23   A    There was no other trauma mentioned.

24   Q    Okay.  So after this entry, what happens to Mr. Fletcher?

25   He, obviously, didn't stay at Perry County, correct?

1   A    He was transferred to St. Luke's University Hospital for

2   dialysis.

3   Q    Thank you.  And was he transferred by a passenger car,

4   ambulance or ambulance or -- I'm sorry.  I said that twice.

5   Passenger car, ambulance or ---

6   A    He was transferred by ambulance.

7   Q    Okay.  Thank you.

8        THE COURT:  Ladies and Gentlemen of the Jury, we will

9   now take our afternoon break.  During this recess and every

10  other recess do not discuss this case among yourselves or with

11  anyone else, including your family and friends.  Do not allow

12  anyone to discuss the case with you or within your hearing.

13  "Do not discuss" also means do not e-mail, send text messages,

14  blog or engage in any other form of written, oral or

15  electronic communications as I have instructed you before.  We

16  will be in recess until about 2:45.

17       THE CLERK:  All rise.  Court is now in recess.

18       (Jury escorted to the Jury Room by the Clerk.)

19       THE COURT:  Dr. Arkin, you can step out of the

20  witness stand while the jury is on break.

21       (Court recessed from 2:27 PM until 2:50 PM.)

22       THE CLERK:  All rise.  Court is again in session.

23       THE COURT:  You may be seated.

24       Mr. Tatlow, you may continue.

25       MR. TATLOW:  Thank you, Your Honor.

```
 1                    CONTINUED DIRECT EXAMINATION

 2   QUESTIONS BY MR. TATLOW:

 3   Q    Now, Dr. Arkin, when you were provided with the file on

 4   Mr. Fletcher, the medical records and incident report, things

 5   regarding this incident, were you also given the bills from

 6   his treatment from this injury?

 7   A    Yes, I was.

 8   Q    Did you have an opportunity to review the Perry County

 9   medical bills and records?

10   A    Yes, I did.

11   Q    And I'd like to approach and hand you this, what's been

12   marked as Plaintiff's Exhibit 2.

13            MR. LUEPKE:  No objection.

14            THE COURT:  You may.

15            MR. TATLOW:  Thank you, Your Honor.

16   Q    (By Mr. Tatlow)  In reviewing the Perry County Memorial

17   Hospital bills for his treatment there after this incident, I

18   show -- Well, what charges do you show, Doctor?

19   A    I see payments here.

20   Q    Let me ask you this way, Dr. Arkin.  I've reviewed the

21   exhibit that you have, and it adds up to $10,820.90.  Have --

22   You've reviewed those in the past, haven't you?

23   A    I have, and now I can add it up.

24   Q    Okay.

25   A    I saw the payment and the amount due, yes.
```

```
 1   Q    Okay.  So let me just ask you this:  Is the total charges

 2   of $10,820.90 reasonable for the treatment he received at

 3   Perry County?

 4   A    Yes, it is.

 5   Q    And was the treatment at Perry County necessary due to

 6   his injuries from this incident?

 7   A    Yes, it was.

 8   Q    Thank you, Doctor.  If I could get that back.

 9        Now before we stopped, you were telling us that

10   Mr. Fletcher was taken by ambulance to St. Louis University

11   Hospital.  Is that correct?

12   A    Yes, he was.

13   Q    And what was the purpose of taking him to SLU?

14   A    That they were going to be able to start dialysis on him.

15   Q    And what was the reason for the need for dialysis?

16   A    He had very severe kidney failure.

17   Q    Okay.  And that was brought on by the trauma you said.

18   Is that correct?

19   A    That's correct.

20   Q    And once he got to St. Louis U, was he placed in a

21   regular room or was he placed somewhere else in the hospital?

22   A    He was placed in their Intensive Care Unit.

23   Q    And why was he in Intensive Care, sir?

24   A    Because he was having a severe metabolic crisis.

25   Q    Okay.  If he wasn't in ICU or didn't undergo kidney
```

1    failure, he might die.  Is that correct?

2    A    Based on his kidney failure causing the problem with

3    other metabolites put him at risk for heart failure and heart

4    attacks.

5    Q    All right.  So how long was he in Intensive Care, sir?

6    A    He was there for several days.  I don't know exactly the

7    number of days.

8    Q    Okay.  Do you have your report with you, also, that you

9    previously prepared?

10   A    Yes, I do.

11   Q    If you turn your attention to Page 3 of 4 on the sheet,

12   and I'd like to ask you about the paragraph that -- beginning

13   with "The impression was acute renal insufficiency."  Can you

14   tell by reading that -- Does that refresh your recollection of

15   how long he was at St. Louis U?

16   A    I'm sorry.  I having trouble finding it in this

17   paragraph.

18   Q    In any event, he was at St. Louis U for a period of weeks

19   at the ICU.  Is that correct?

20   A    He was in -- He was there until April 3rd.

21   Q    Okay, April 3rd.  So 3-19-13 to 4-3-13.  Is that correct?

22   A    That's correct.

23   Q    And what did they do for him at St. Louis U?

24   A    They gave him IV medication to prevent seizures.  They

25   did dialysis on him.  They gave him fluids, and they gave him

```
 1   glucose to try to turn around the kidney failure.

 2   Q    Did they also do lots of testing of Mr. Fletcher?

 3   A    They did.

 4   Q    Various scans or CT scans or what did they do?

 5   A    They did CT scan, an MRI.  They did a spinal tap.  They

 6   did a CT chest.  They did chest X-rays.

 7   Q    Was that all necessary due to the injuries he'd suffered

 8   with this trauma with the officers?

 9   A    That's correct.

10   Q    How would you classify the category he was in in mild,

11   moderate to severe?

12   A    He was in severe trouble.

13   Q    Now the CT scans that they took at SLU, did that confirm

14   the diagnosis of a brain injury?

15   A    Yes, it did.

16   Q    And is that consistent with your own opinions?

17   A    Yes, it is.

18   Q    You mentioned earlier that bone -- I'm going to show you,

19   Doc, if you can look up.  That bone across the eye into the

20   cheekbone, was that the zago ---

21   A    That's the zygomatic arch.

22   Q    Zygomatic arch fracture.

23   A    That's correct.

24   Q    Is it easier -- Is there some layman term that's easier

25   to call that by?
```

1    A    Basically it's the bone that's above the cheekbone that

2    attaches to the eye socket itself.

3    Q    Okay.  So that was broken?

4    A    Correct.

5    Q    By trauma?

6    A    Yes.

7    Q    And then at St. Louis U, did they do any testing of the

8    nose or any CT scans for the nose?

9    A    They did -- Correct.  They did scans of the facial

10   structures themselves of the bones, and also saw that there

11   was a nasal fracture, a nose fracture.

12   Q    Okay.  So the nasal and nose fracture had been missed

13   previously, I guess?

14   A    Correct.

15   Q    Do you have an opinion based on reasonable medical

16   certainty whether that was due to the trauma of being hit in

17   the face or the door slamming on the face?

18   A    I believe that that was a trauma directly to the face at

19   one point or another at that time.

20   Q    All right.  After Mr. Fletcher received the dialysis, did

21   his kidneys get a little better?

22   A    They did.

23   Q    Did he get to the point where he was finally discharged

24   from St. Louis U?

25   A    He was.

1   Q    And what was his diagnosis on the date of discharge?

2   A    The final diagnosis was acute renal failure and that he

3   also was having post-traumatic headaches.

4   Q    Now "post-traumatic headaches," what does that mean?

5   A    Post-traumatic headaches are headaches that you have that

6   weren't apparent or significant in terms of frequency after a

7   trauma, a direct trauma, to the head and to the brain that

8   causes the headaches.

9   Q    I also saw in the records there was some references to

10  vomiting, dizziness and confusion.  Did you note that?

11  A    I did.

12  Q    And what's the importance of someone vomiting, being

13  dizzy or confused?

14  A    Well, that can be changes in this situation from the head

15  injury itself.  It can be from kidney failure, and I believe

16  in this situation it was from a combination.

17  Q    All right.  Have you had instances where you've treated

18  people in the hospital or clinically for the traumatic brain

19  injuries like Mr. Fletcher had?

20  A    I have.

21  Q    And can you give us other examples of the force that it

22  takes to injure the brain like his was injured?

23  A    I have had people that have been hit on the head with a

24  bat.  I have had a person just this past weekend that fell

25  down a flight of stairs, about ten stairs.  It takes a

1    considerable amount of force due to the things that happen.

2    Q    How about these football players?  We all may have seen

3    the movie *Concussion*.  Is that a similar-type injury?

4    A    Very similar.

5    Q    Okay.  Now are there any other long-term consequences or

6    sequelae, I would say, of injuries from brain injuries that

7    someone may experience the rest of their lifetime?

8    A    Correct.

9    Q    What are those, Doctor?

10   A    Those are a high frequency of headaches, dizziness and

11   fainting spells.  It can be nausea, and it could be thinking

12   problems in terms of memory and being able to figure things

13   out.

14   Q    Do you believe that Mr. Fletcher will have the need for

15   medical treatment in the future due to his headaches, his

16   brain injury or kidney problems?

17   A    I do.

18   Q    And what sort of treatment would you expect him to need

19   in the future?

20   A    He will need symptomatic treatment for his headaches and

21   for some of his dizziness, and he will need continued

22   surveillance for some of his thinking problems.

23   Q    All right.  And how often would you expect him to be --

24   need to be checked out, Dr. Arkin?

25   A    I see people like this, and I treat them about every

```
 1   three months; try to change their medication so that they can
 2   be better acclimated to what's happening to them.
 3   Q    What type of a doctor should he see for the head?
 4   A    For the head, in terms of the confusion as well as for
 5   the headaches, he should be seen by a neurologist.
 6   Q    Okay.  Someone like you?
 7   A    Correct.
 8   Q    And how about for the kidneys?
 9   A    The kidney doctors, they call them "nephrologists."  He
10   should be seeing them to test the kidneys on a regular basis.
11   Also, they're Internal Medicine doctors.
12   Q    Did you say a kidney specialist is called a
13   "nephrologist"?
14   A    Correct.
15   Q    Okay.  So there's actually someone like a neurologist and
16   someone like a nephrologist?
17   A    That's correct.
18   Q    Okay.  So Neurology, that's your specialty, and
19   Nephrology is a kidney -- a further kidney specialty, correct?
20   A    That is correct.  They're different.
21   Q    Okay.  But you also had training in Internal Medicine?
22   A    I did.
23   Q    And did you experience the need to study the kidneys and
24   treat the kidneys in that practice?
25   A    We studied Internal Medicine for a year in preparation
```

1   for a Neurology residency where we were trained on all parts

2   of the body, including the kidney.

3   Q    Okay, very well.  And I also -- I believe you were sent

4   the St. Louis University bills and records, and you've talked

5   about the records.  Is that correct?

6   A    Correct.

7   Q    And the St. Louis University bills, those are marked with

8   the records as Plaintiff's Exhibit 3.  And I'd like to ask

9   you:  I show charges of $165,665.89 through the dates of

10  hospitalization.  Is that your recollection, Doc?

11  A    That is correct.

12  Q    And then there's also things labeled "Labs, Blood and

13  Labs" totaling 5,450.63.  Is that your understanding?

14  A    Yes, it is.

15  Q    And we'll introduce those as a whole to -- so the jury

16  can see those later, but the total of those at St. Louis

17  University are $171,116.52.  Is that correct?

18  A    Yes.

19  Q    Do you have an opinion whether the treatment at SLU in

20  the amount of a little over $171,000 was all necessary due to

21  the injuries from these officers?

22  A    I do.

23  Q    And what is that opinion?

24  A    My opinion is that based on the ICU setting and dialysis,

25  it's quite extensive, and that those injuries were sustained

1    during that incident.

2    Q    Do you have an opinion whether the charges at St. Louis

3    University are reasonable and customary in the community?

4    A    Yes, I do.

5    Q    And what's that opinion, Doctor?

6    A    My opinion is that based on looking at records of my

7    patients, that that is within customary.

8    Q    When I add up the Perry County bills you told us about

9    and all the SLU bills, the total comes to $181,937.42.  Do you

10   believe or do you have an opinion whether all of those bills

11   are both reasonable and necessary due to the trauma induced

12   from these officers?

13   A    Yes, I do.

14   Q    And what's that opinion?

15   A    My opinion is that that is consistent with those types of

16   injuries and the treatment that was given.

17   Q    And do you believe that was caused by these officers?

18   A    Yes, I do.

19        MR. TATLOW:  Thank you.  Nothing further.

20        THE COURT:  Cross Examination?

21        MR. LUEPKE:  Yes, Your Honor.

22                    CROSS EXAMINATION

23   QUESTIONS BY MR. LUEPKE:

24   Q    Doctor, you are not a St. Louis doctor.  Is that correct?

25   A    That's correct.

1    Q    Your medical practice is located in Kansas City,

2    Missouri, correct?

3    A    Correct.

4    Q    You live there as well in Kansas City?

5    A    Live in a suburb, yeah.

6    Q    A big part of your practice is in providing medical

7    opinion for testimony in lawsuits such as this, correct?

8    A    That's about ten percent of what I do.  My general job is

9    to see patients in the office and then in the hospital.

10   Q    How much are you being paid for your testimony today?

11   A    5000.

12   Q    And how much have you charged for your testimony and the

13   work that you've done in this case so far?

14   A    About 4000.

15   Q    All right.  What amount has been paid?

16   A    I believe most of it has been paid.  I think all but 500.

17   Q    And who has paid that amount?  Plaintiff or Plaintiff's

18   counsel?

19   A    Plaintiff's counsel.

20   Q    And who is it that first hired you to provide expert

21   testimony on behalf of Calvin Fletcher?

22   A    Mr. Herman.

23   Q    Mr. Herman.  Who is "Mr. Herman"?

24   A    Jeffrey Herman is one of the partners with Tatlow or was.

25   I believe he's not there anymore.

1    Q    One of Plaintiff's counsel's former partners?

2    A    Correct.

3    Q    All right.  And when were you hired to provide expert

4    testimony in this case?

5    A    My understanding was in the Spring of 2015.

6    Q    If I told you it was March 13th of 2015, would you

7    disagree?

8    A    That's in the spring, correct?

9    Q    That's correct.

10   A    Yes.

11   Q    All right.  So that was more than two years after this

12   incident, is that right?

13   A    It's at two years, correct.

14   Q    All right.  Now you understand that Calvin Fletcher was

15   arrested back in March of 2013, more than two years prior to

16   the time you performed any services; correct?

17   A    Correct.

18   Q    Now let's talk about what you've done for Mr. Fletcher.

19   Did you ever visit the scene of the arrest?

20   A    No.

21   Q    Do you know where the arrest occurred?

22   A    I don't know the area, no.

23   Q    All right.  Did you ever speak with any of the arresting

24   officers?

25   A    No.

```
 1    Q    Did you ever speak with any of his superior officers that
 2    reviewed the arrest?
 3    A    I have not.
 4    Q    Did you review any deposition testimony of any witness in
 5    this case?
 6    A    I have not.
 7    Q    Did you ever conduct a physical examination of the
 8    Plaintiff, Mr. Fletcher?
 9    A    No.
10    Q    In fact, before your deposition in this case, you had
11    never met or even spoken with Mr. Fletcher, had you?
12    A    Not before the deposition, correct.
13    Q    All right.  Have you since spoken to him?
14    A    I have spoken to him once.
15    Q    Pardon me?
16    A    I have spoken to him once.
17    Q    Once?
18    A    Correct.
19    Q    When was that?
20    A    About a week ago.
21    Q    Just one week ago?
22    A    Correct.
23    Q    That was the first time you ever spoke to Mr. Fletcher?
24    A    That's correct.
25    Q    And at that time did you examine Mr. Fletcher?
```

1   A     I examined him by speaking to him.  Neurologists tend to

2   do that.  We talk to people and find out what their problems

3   are.

4   Q     Okay.  So you were depending on what Mr. Fletcher told

5   you, correct?

6   A     My listening to him as well as what he's told me, yes.

7   Q     What's the difference between listening to him and

8   hearing what he told you?

9   A     I also will be listening to how quickly he answers my

10  questions.  If he is repeating things that I have mentioned,

11  if he is repeating himself, those are very important from a

12  neurologist standpoint.

13  Q     And what he tells you you take to be true.  Is that

14  right?

15  A     The actual amount of information or the type of

16  information that he gives me is all that I have.  So I do make

17  representation knowing what his difficulties are.  So mostly I

18  was listening to the way that he presented the information

19  rather than the actual information itself or as well as.

20  Q     Okay.  So the information that you have in this case is

21  information that Mr. Fletcher gave you.

22  A     From Mr. Fletcher as well as the records that were

23  provided to me.

24  Q     And those records were provided to you by whom?

25  A     By the Plaintiff counsel.

1    Q    By the Plaintiff's counsel that hired you, correct?

2    A    That's correct.

3    Q    All right.  Now you understand that Plaintiff's counsel

4    did not provide you all of the medical records, don't you?

5    A    I would think that they provided me the information that

6    I needed in that I had enough information to form an opinion.

7    Q    Okay.  And you relied on Plaintiff's counsel to provide

8    you the appropriate records, didn't you?

9    A    I provided -- I was counting on them to provide me the

10   information to render an opinion.

11   Q    Okay.  Now based on your review of the records that

12   Plaintiff's counsel gave you, isn't it your opinion that

13   Mr. Fletcher's medical condition was made worse by the care he

14   received after being dropped off at the City Justice Center?

15   A    I believe that there was a combination of things that

16   were happening; that there was an original injury and that

17   there was a certain amount of care given and that the injury

18   was the predominant problem in terms of what was happening to

19   him.

20   Q    Okay.  I'm not sure you've answered my question.  The

21   question is:  Was Mr. Fletcher's condition made worse by the

22   quality of medical care that he received after his arrest

23   after his delivery to the City Justice Center?

24   A    There was an interpretation by St. Luke's or -- I'm

25   sorry; St. Luke's -- St. Louis University that he was not

1    eating and drinking well at the Center, and that would have

2    contributed to some of his problems with rhabdomyolysis as

3    well as his kidney insufficiency.

4    Q    So your answer to my question is "yes."  His condition

5    was made worse by the medical care that he received.

6    A    I just want to explain why.

7    Q    Okay.

8    A    Yes.

9    Q    But you're agreeing with that, correct?

10   A    Correct.

11   Q    Okay.  And you understand, don't you, that none of these

12   arresting officers had anything to do with or were responsible

13   for providing the medicine that Mr. Fletcher received at The

14   Justice Center, correct?

15   A    I do.

16   Q    And I think it's your opinion then that Mr. Fletcher

17   developed more serious medical needs, requiring further

18   investigation and intervention, after he received care at The

19   Justice Center, correct?

20   A    My indication is that he was evaluated at a time where he

21   was exhibiting enough symptoms to warrant that investigation.

22   Q    And, in fact, it's your opinion that the staff at The

23   Justice Center failed to follow medical protocols and

24   policies, isn't it?

25   A    My opinion is that he could have been served in a

1    hospital in terms of observing what was going on and that I

2    could not speculate in terms of how much change took place

3    from a metabolic standpoint while he was in The Justice

4    Center.

5    Q    Let me ask you this:  What's your opinion of the quality

6    of medical care he received after being delivered to The

7    Justice Center?

8    A    I believe that he was observed, and that when there were

9    changes, that he went to the place that he needed to be at the

10   time that he was experiencing more problems.

11   Q    And after -- And after he was -- arrived at The Justice

12   Center, the medical care that he received was inadequate,

13   correct?

14   A    I believe that it could have been better, but I don't

15   think that that's what caused his problem in the end.

16   Q    Okay.  But -- Well, is it not your opinion that it was

17   the medical staff at the city infirmary that caused a

18   persistence of Mr. Fletcher's headaches, dizziness and

19   convulsive activity by not providing the right medication?

20   Isn't that your opinion?

21   A    My -- My opinion is that there was advancing renal

22   insufficiency which eventually caused the convulsion that led

23   to his admission at St. Louis University.

24   Q    So your opinion is that it was -- if it was not a --

25   that -- or I'm sorry.  The medical staff at the city infirmary

1    did not cause a persistence of Mr. Fletcher's headaches,

2    dizziness and convulsive activity.  Is that your testimony

3    today?

4    A     My opinion is that based on his traumatic head injury,

5    that with or without any change in the care, that he would

6    still be exhibiting the headaches that he has today --

7    Q     All right.

8    A     -- with or without that care.

9    Q     All right.  But do you or do you not agree that the

10   medical care that he received at the city infirmary caused the

11   persistence of his headaches, dizziness and convulsive

12   activity?

13   A     At the time that he was in the St. Louis Justice Center,

14   he was having those problems that were treated with

15   medication.  Due to his traumatic injury, he has persistent

16   problems now that were not changed by the fact that he was in

17   the St. Louis Justice Infirmary for several days before he was

18   transferred.

19   Q     Should he have received an expedited MRI at The Justice

20   Center?

21   A     That would not have changed anything.

22   Q     All right.  Is it your opinion that he should have

23   received it?

24   A     It would not have changed the overall outcome, no.

25   Q     Did you understand my question?

1    A     Try it again.

2    Q     Should he have received an expedited MRI when he got to

3    The Justice Center?

4    A     An MRI would not have changed anything.

5    Q     All right.  So your opinion is that he should not have

6    received an MRI at The Justice Center.

7    A     It would not have changed the overall outcome, and he

8    does not need to have had an MRI done.  The MRI was basically

9    to try to figure out what that lesion was in the left back

10   part of his brain, the cerebellum.

11   Q     Now isn't it true that his kidney problem was caused by

12   the fact that he was unable to eat or drink while at the City

13   Justice Center?

14   A     People who don't eat or drink don't develop that level of

15   kidney failure without the prior trauma.

16   Q     Do you remember giving your deposition in this case?

17   A     It was on August 26th, 2015.

18   Q     Yeah.  And do you recall you were sworn to tell the

19   truth?

20   A     I do.

21   Q     And you took an oath to tell the truth at your

22   deposition?

23   A     I did.

24   Q     All right.  Let me ask you if you recall being asked this

25   question and giving this answer:  Question ---

1           MR. TATLOW:  Excuse me.  Can I ask what page?

2           MR. LUEPKE:  I'm sorry.  It's Page 44; Page 44 at

3    Lines 21 to 25.

4           MR. TATLOW:  Thank you.

5    Q    (By Mr. Luepke)  Question:  "Are you going to provide an

6    opinion on what caused Mr. Fletcher's kidney failure?"

7           Answer:  "As I've stated before, his kidney failure,

8    which was acute and dramatic, was caused by his inability to

9    drink fluids and to eat."

10          Did I read that correctly?

11   A    I have to have it in front of me, but did you say

12   "dramatic" or "traumatic"?

13   Q    I said "dramatic" is what the transcript reads.  It was

14   "acute and dramatic."

15   A    What I meant by that sentence is that the changes of

16   advancing kidney failure are related in part to not eating and

17   drinking appropriately.  When you are dehydrated, you do have

18   kidney failure but not to the effect that he had.

19   Q    Okay.  But you didn't happen to mention that when you

20   were asked the question of what caused Mr. Fletcher's kidney

21   failure.  All you said was his inability to drink fluids and

22   to eat.

23   A    I'll agree that I did not qualify the answer at the time.

24   Q    Okay.  So your testimony has changed now that we're in

25   court today, correct?

110

1    A    Not that we're in court today, but I didn't qualify it at

2    the time.

3    Q    Now in preparing your testimony, did you review the

4    deposition of any other doctors that Plaintiff and his lawyers

5    hired to testify for them in this case?

6    A    The only other doctor, that was Dr. Berns and Dr. Ross.

7    Q    So you did look at Dr. Ross' testimony?

8    A    Yes, I did.

9    Q    Did you speak with Dr. Ross?

10    A    No, I didn't.

11    Q    Did you see where Dr. Ross stated that -- or in his

12    opinion that Mr. Fletcher's kidney problems were primarily due

13    to the fact that some prison medical staff gave him some

14    nonsteroidal anti-inflammatory drug?

15    A    My understanding is, as I read through the record, that

16    he was given Tylenol and Norco which is not the nonsteroidal

17    inflammatories.  That was kidney failure.

18    Q    Okay.  So you disagree with that opinion from Dr. Ross,

19    correct?

20    A    Based on the set of circumstances as well as the

21    knowledge of which medications he received.

22    Q    All right.  Now -- Now what other criticisms do you have

23    of medical care that Mr. Fletcher received after being

24    delivered to the City Justice Center?

25    A    I don't believe that I have any others.  I don't have any

1    other opinions regarding other criticisms.

2    Q    Now after leaving the City Justice Center and the

3    infirmary in the City of St. Louis, Mr. Fletcher was then

4    transferred down to Perry County.  Is that your understanding?

5    A    That's correct.

6    Q    Do you know why he was transferred down to Perry County

7    after being in the St. Louis City Jail?

8    A    My understanding by reading the records is that he had

9    traffic warrants in that location.

10   Q    He then was delivered -- Was he examined by medical

11   staff, according to your review?

12   A    My review is that he was diverted from the jail system

13   over to the Perry County Hospital.

14   Q    And you do recognize, Doctor, that the Perry County

15   doctors concluded that Mr. Fletcher did not need to be

16   admitted to a hospital down there, correct?

17   A    My understanding is that they -- he left that Emergency

18   Room.  He did not get admitted to that hospital.

19   Q    How long was he in the medical -- was he in the Emergency

20   Room?

21   A    I don't know exactly how many hours, but it was not more

22   than a few hours.

23   Q    So they looked at him in a few hours, and he was

24   discharged immediately; correct?

25   A    I don't know the definition of "immediately," but he was

1    discharged after they evaluated him in the Emergency Room.

2    Q    Oh.  In your review of the records, did you see that

3    paramedics had come to the scene of the arrest and examined

4    Mr. Fletcher?

5    A    That's my understanding prior to going -- You're talking

6    about St. Louis Justice Center --

7    Q    I'm saying ---

8    A    -- or ---

9    Q    I'm talking about the scene of the arrest.

10   A    Okay.

11   Q    I know you didn't visit the scene.  I know you weren't

12   part of the arrest.  I know you didn't get involved in this

13   case till more than two years later, but what I'm asking is

14   whether or not you reviewed any of the records that were made

15   by the paramedics that at the scene of the arrest examined

16   Mr. Fletcher?

17   A    I don't recall specifically the verbiage that was done --

18   that I would have looked at, but I looked at the intake into

19   The Justice Center.  I don't recall specifically looking at

20   the parametric -- paramedic record.

21   Q    All right.  Now if I told you that in -- the paramedics'

22   records reflect that Mr. Fletcher had told them at the scene

23   of the arrest that he denied any pain or injuries, would that

24   be consistent with what you saw?

25   A    Well, from what I saw in the record and what I know

```
 1    medically, that would be -- that would be a reasonable thing

 2    to see or to hear.

 3    Q    So it would be -- it would be reasonable, based on the

 4    records that you've seen, for Mr. Fletcher at the scene of the

 5    arrest to deny that he had any pain or injuries.

 6    A    That's correct.

 7    Q    Thank you.  Let's talk a little bit about Mr. Fletcher's

 8    medical history at the time that you reviewed the records that

 9    his lawyers provided to you.  I think you mentioned that he

10    had other infectious disease problems based on your review?

11    A    No, I didn't mention that.  I mentioned that that's what

12    a CT scan might be looking for.

13    Q    Oh, okay.  And the CT scan did not reveal any other

14    infectious problems?

15    A    The CT scan did not reveal any infection.

16    Q    Are you aware that Mr. Fletcher has been diagnosed with

17    syphilis?

18    A    I'm aware.

19    Q    And you recognize that Mr. Fletcher has a history of

20    schizoaffective disorder?

21    A    That's what's written in the chart.

22    Q    What is "schizoaffective disorder"?

23    A    Schizoaffective disorder is a psychiatric term, and it

24    represents -- "affective" means usually depression and the

25    "schizo" part is some type of psychosis.
```

1    Q     In fact, you would agree, Doctor, that Mr. Fletcher has a

2    long-term history of psychiatric disease, including bipolar

3    disorder and depression?

4    A     That's what's written in the record.

5    Q     Pardon me?

6    A     That's what is written in the record.

7    Q     All right.  And you have no reason to dispute the

8    accuracy of what's in those records, do you?

9    A     I have no reason to.

10   Q     All right.  And Mr. Fletcher has been suffering from

11   those conditions since the time of his arrest in March of

12   2013, correct?

13   A     He has been having problems in terms of his thinking and

14   memory as well as his psychiatric condition, correct.

15   Q     And, in fact, I think you mentioned that one of the

16   symptoms or results of what has happened to Mr. Fletcher is

17   that he's experiencing confusion, correct?

18   A     He is.

19   Q     And how would you describe the confusion?  How does that

20   exhibit itself?

21   A     It exhibits itself in his day-to-day activities; that he

22   leaves things unattended and that he cannot make proper

23   decisions; that he has to rely on others.  He has to use

24   things like debit set-up instead of paying for his bills on

25   his own, those types of things.

1    Q    He's very forgetful, isn't he?

2    A    He is having problems with his memory, yes.

3    Q    Yes.

4         MR. LUEPKE:  Thank you.

5         THE COURT:  Redirect?

6         MR. TATLOW:  Thank you, Your Honor.

7                   REDIRECT EXAMINATION

8    QUESTIONS BY MR. TATLOW:

9    Q    Now, Dr. Arkin, I'd like to ask you:  In your practice in

10   your neural consulting in the hospital and the private

11   practice, is it common practice for someone to hire you to do

12   a neurological consultation where you look at the records and

13   give an opinion on their condition?

14   A    Yes.  I have to do that all the time.  I have to look at

15   prior records to put it into context of what I see in front of

16   me.

17   Q    Is there anything unusual about us sending you all the

18   records of that trauma and what happened to Mr. Fletcher and

19   asking your opinion on the causation?

20   A    No, it's not.  It's consistent with what I do.

21   Q    And I believe you said you did some legal cases.  And

22   what percent of your overall income is that?

23   A    It's about ten percent.

24   Q    Ten percent.  And do you do that for people like

25   Mr. Luepke and the defense in cases, too?

1    A    I do.

2    Q    What percentage of your practice is made up of doing it

3    for the defense versus the plaintiff when you do legal things?

4    A    Of the litigation that I do, about 60 percent is on the

5    defense side and 40 percent on the plaintiff side.

6    Q    Okay.  So you do have more for people like Mr. Luepke and

7    defense firms than plaintiffs.  Is that correct?

8    A    That's correct.

9    Q    And it's only overall ten percent of your income?

10   A    That's right.

11   Q    All right.  And in those cases is it common for attorneys

12   or law firms like Mr. Luepke to send you the records, too, and

13   ask your opinions on causation and what injuries they

14   sustained due to assaults or traumatic incidents?

15   A    That's correct.

16   Q    And is it sometimes your situation where you do that

17   based on the records and talking to the patient?

18   A    That is correct.

19   Q    All right.  Is there anything about syphilis,

20   schizoaffective disorders or the psychiatric disease that

21   affected him that you're saying was caused by this incident or

22   is that wholly unrelated to this incident?

23   A    I believe it's unrelated to the incident; that there were

24   changes at the time of the incident going forward that were

25   different than those disease processes.

1    Q    And, again, what were the primary injuries he suffered

2    from trauma in this case, Dr. Arkin?

3    A    He had post-traumatic headaches, dizziness, nausea,

4    fainting spells and cognitive issues, thinking issues.

5    Q    Was the kidney failure due to this trauma as well?

6    A    Yes.

7    Q    And did you also read one of the Defendant's doctor's

8    depositions, Dr. Berns?

9    A    I did.

10   Q    What kind of doctor is he?

11   A    He's a kidney doctor.

12   Q    What do they call those again?

13   A    Nephrologists.

14   Q    Okay.  You've a neurologist and Dr. Berns is a

15   nephrologist, correct?

16   A    Yes.

17   Q    And he was hired by -- Who was that?  Someone else?

18   A    Yes.

19   Q    Not me?

20   A    It was not you.

21   Q    One of the Defendants, correct?

22   A    Correct.

23   Q    And in that case did he -- did you agree or disagree with

24   his final opinion on the causation of the kidney issues?

25   A    I agreed with it.

1    Q    What was that opinion?

2    A    That the kidney failure was due to the trauma.

3    Q    And that was from one of Defendants' own doctors,

4    correct?

5    A    That's correct.

6         MR. TATLOW:  Thank you, Doctor.  Nothing further.

7         THE COURT:  May Dr. Arkin be excused?

8         MR. LUEPKE:  No, Your Honor.  We have some follow-up

9    questions.

10        THE COURT:  I mean keep your questions very limited

11   because you had a chance to cross-examine.  I didn't hear

12   anything new that he brought up that you didn't address.

13        MR. LUEPKE:  There is something new, Your Honor.

14   That's what I'm going to focus on.

15        THE COURT:  All right.  Well, go specifically to

16   that.

17        MR. LUEPKE:  Yeah.

18                    RECROSS EXAMINATION

19   QUESTIONS BY MR. LUEPKE:

20   Q    Who is it that hired Dr. Berns?

21   A    My understanding is the defense.

22   Q    What defense?

23   A    I don't recall exactly which one of you.

24   Q    Have you heard of a defendant called "Corizon"?

25   A    Corizon, I believe, is St. Louis Justice.  Is that

1    correct?  I don't know for sure.

2    Q    It's your testimony, sir.  I'm asking you the questions.

3    A    My understanding ---

4    Q    You testified that a defendant hired Dr. Berns, and I'm

5    asking you:  What defendant hired Dr. Berns?  Do you know the

6    answer?

7              MR. TATLOW:  I'm going to object to the form of the

8    question.  That's argumentative.

9              THE COURT:  Sustained.  You may rephrase your

10   question.

11   Q    (By Mr. Luepke)  Who is the defendant that hired

12   Dr. Berns?

13   A    I don't know.

14             MR. LUEPKE:  Thank you.

15             THE COURT:  May Dr. Arkin be excused?

16             MR. TATLOW:  Yes, Your Honor.

17             MR. LUEPKE:  Yes, Your Honor.

18             THE COURT:  Doctor, you're free to leave unless

19   Mr. Tatlow has something further.

20             MR. TATLOW:  No, sir.

21             THE COURT:  Please call your next witness.

22             MR. ZOOLE:  Plaintiff calls Jonathan Carroll.

23        (The Witness, JONATHAN CARROLL, Is Sworn.)

24

25

```
 1                    DIRECT EXAMINATION

 2   QUESTIONS BY MR. ZOOLE:

 3   Q    Good afternoon, sir.  Would you please tell the Jury your

 4   name?

 5   A    Police Officer Jonathan Carroll.

 6   Q    You're a policeman for the City of St. Louis?

 7   A    Correct.

 8   Q    You have been since 2008, correct?

 9   A    2009.

10   Q    Okay.  Well, you actually started in the Academy with the

11   St. Louis Police Department --

12   A    In 2008, yes.

13   Q    -- in 2008, correct?

14   A    Yes.

15   Q    And you then started as a policeman after your Academy

16   training was over right at the beginning of 2009, correct?

17   A    Yes, correct.

18   Q    And do you have a particular rank?  Corporal or Sergeant

19   or something like that?

20   A    Police Officer.

21   Q    Police Officer.  Is that -- Is that the rank you've held

22   since you started as a policeman?

23   A    Other than probationary, yes.

24   Q    Okay.  Probationary is what you are for your first year

25   on the job?
```

1    A    Correct.

2    Q    You've heard us refer, both Mr. Luepke and I, to the --

3    to the patty wagon or the cruiser or the transport?

4    A    Yes.

5    Q    Are all three of those terms fairly interchangeable in

6    your mind?

7    A    Cruiser, patty wagon, yes.

8    Q    All right.  Describe that for me.

9    A    It's a full-size van with a prisoner cage in the back.

10   It has two seats, a driver's seat and a passenger seat.

11   That's it.

12   Q    And it's a van for transporting arrestees in the City of

13   St. Louis, right?

14   A    Correct.

15   Q    Okay.  It's a converted Chevy 3500, correct?

16   A    That may be what's used.  I don't know what the -- if

17   it's a 3500 or not.  I couldn't say; probably.

18   Q    Okay.  You started driving the patty wagon on a regular

19   basis in 2011, maybe early 2012; correct?

20   A    Probably.

21   Q    And that was your normal assignment, right?

22   A    For a little while, yeah.

23   Q    And it was your normal assignment through March of 2013,

24   anyway, correct?

25   A    The night of this incident I was in a cruiser, yes.

1   Q    And when you're driving the patty wagon, when you're

2   driving the cruiser, your duties are the same as a regular

3   patrol officer.  You're just in a different kind of vehicle,

4   correct?

5   A    Other than transporting prisoners, yes.

6   Q    Sure.  You're in a one-man unit.  You work alone,

7   correct?

8   A    Correct.

9   Q    When had you met Joseph Tomlinson?

10  A    Mr. Tomlinson, he was in my Academy class.

11  Q    So back in 2008?

12  A    (Affirmative gesture).  Yes.

13  Q    And you went through that Academy class for how long --

14  how many months together?

15  A    Approximately six.

16  Q    And had you ever worked with Mr. Moton here before?

17  Before 2013.

18  A    Yes.

19  Q    You had been on the same squad with him, correct?

20  A    Yes.

21  Q    And a squad is the same group of five or six policemen

22  who all work together, correct?

23  A    Yes.

24  Q    There was a lot of interaction between the guys on the

25  same squad, correct?

1   A    What do you mean by "interaction"?

2   Q    I'm sorry?

3   A    What do you mean by "interaction"?

4   Q    Well, what do you ---

5   A    I mean did we talk?  Yes.

6   Q    You -- You've used the term that you interact together.

7   A    Right.  We talk.

8   Q    All right.  Did you personally know Mr. Martorano --

9   A    No.

10  Q    -- as of March 6th, 2013?

11  A    No.

12  Q    Do you think you might have known his name, though?

13  A    I may have heard his name.

14  Q    Okay.  Do you remember what you heard about him or how

15  you heard about him?

16  A    No.

17  Q    You were on duty the evening of March 6th, 2013, correct?

18  A    Correct.

19  Q    Driving the patty wagon?

20  A    Yes.

21  Q    And you came to the intersection of Cass and 13th,

22  correct?

23  A    I was requested to the intersection, yes.

24  Q    And when you got there, you got out of the patty wagon?

25  A    Yes.

124

1    Q    Okay.  And you stayed at the scene for a little over 20

2    minutes.  Is that right?  I'm sorry; 40 -- 40 minutes.

3    A    I don't know how long I was there.

4    Q    Okay.  I'm going to show you what's been marked as

5    Exhibit 15.  It's the radio traffic log.  Looking at Page --

6    the third page of it which is Bates stamped "Fletcher 59," are

7    you -- 506, right?

8    A    Correct.

9    Q    Here.

10   A    Yes.

11   Q    2-5-0-6?

12   A    Yeah, 2506.

13   Q    That's you.

14   A    Yes.

15   Q    When -- When were you dispatched to go to the scene at

16   Cass and 13th?

17   A    8:26.

18   Q    Okay.  PM.

19   A    Correct.

20   Q    Okay.  What -- When did you arrive?

21   A    8:29.

22   Q    Okay.  So it took you about -- right around three minutes

23   to get there, correct?

24   A    Yes.

25   Q    And "DP," I guess, is "dispatched"?

125

1    A    Correct.

2    Q    "AR" is "arrived"?

3    A    Correct.

4    Q    What's -- I see a reference to "ER" here.  What's that

5    refer to?

6    A    "En route."

7    Q    Okay.  And is that -- Does that refer to the time you

8    left then?  12 minutes after 9:00?

9    A    Yes.

10   Q    That would be the time you left the scene at 13th and

11   Cass then, right?

12   A    I believe so, yeah.

13   Q    All right.

14   A    I went somewhere.  I couldn't -- According to the log

15   there, it says I went to the station.

16   Q    Okay.  But that's -- Is that right?  Did you go to the

17   station?

18   A    I did not.

19   Q    Right.  Rather, you went where?

20   A    I went to The Justice Center.

21   Q    All right.  Were there any other people with you in the

22   patty wagon when you left the scene?

23   A    Other than your client, no.

24   Q    Okay.  So Mr. Fletcher was in the back, right?

25   A    Correct.

1    Q    And it was just the two of you in the vehicle at that

2    time, correct?

3    A    Yes.

4    Q    When you got to The Justice Center or the jail with

5    Mr. Fletcher, you opened the back doors of the patty wagon?

6    A    Correct.

7    Q    And some other officers took him inside the building,

8    correct?

9    A    Correct.

10   Q    When you -- When you arrived at the scene -- Well, let me

11   ask you:  The patty wagon has cameras, right?  A dashboard

12   camera?

13   A    Yes.

14   Q    And it also has a camera that shows the interior of the

15   patty wagon, correct?

16   A    The cage.

17   Q    Right.  So you call it "the cage."  The back -- The back

18   inside part of it, right?

19   A    Correct.

20   Q    Such that if the doors were open, you could see outside

21   toward the rear of the patty wagon, correct, from that

22   interior camera?

23   A    You'd see shapes.  They're not that -- They're not

24   high-definition cameras.

25   Q    Yeah.  And I'm just trying to get the orientation,

1    though.

2    A      Right.

3    Q      It's almost like a camera that ---

4    A      Yeah.  It's in the front of the cage, pointing back.

5    Q      Pointing backwards.  There we go.  Let me show you ---

6           MR. ZOOLE:  Excuse me, Judge.

7           (Pause)

8           MR. ZOOLE:  This would be Exhibits 9 and 10.  I

9    apologize, Your Honor.  I should have hooked this up before

10   this examination.

11   Q      (By Mr. Zoole)  I'm going to show you Exhibit 9, and I'll

12   ask you to describe what this is.

13   A      That would be the inside of the cage.

14   Q      All right.  So that's the view of the inside of the patty

15   wagon you were driving as of 26 minutes after 8:00 on March

16   6th, 2013, correct?

17   A      According to the time, yes.

18   Q      All right.  Any reason to dispute that, that timeframe?

19   A      I don't have any reason, no.

20   Q      Okay.  And it's consistent with what we saw as the radio

21   -- with the radio logs, right?

22   A      I believe so, yes.

23   Q      Okay.  Now have you -- You've seen this video before,

24   right?

25   A      I have.

128

1    Q    It's about three minutes long, correct?

2    A    Okay.  I think.

3    Q    Now we're hearing some sound.  What are we hearing?

4    A    I can barely hear it.  Sounds like a siren.

5    Q    Okay.  And would that be the siren -- Did you have a

6    siren on?

7    A    I did.  I respond with lights and siren.

8    Q    All right.  I'm going to fast-forward it unless you --

9    When you -- And you've seen this before.

10         MR. ZOOLE:  I want to save some time, Your Honor.

11   Q    (By Mr. Zoole)  I'll fast-forward it about two minutes to

12   the approach of the scene on the interior view.  Would you

13   agree that the video continues to show exactly what we've seen

14   so far?

15   A    It's an empty cage.

16   Q    Right.  So we fast-forward it to 8:29 and 10 seconds.

17         (Pause)

18   Q    And that's where it ends.  Do you see that at 8:29 and 39

19   seconds?

20   A    Yes.

21   Q    Was there any more footage that was -- that was kept from

22   this point on or that was recorded?

23   A    No.

24   Q    Why not?  Why did the camera go off at 8:29 and 39

25   seconds?

1    A    Because I arrived on scene and shut it off.

2    Q    I want to show you the -- this second view.  This is

3    Exhibit 10.  Hang on a second.  Let me make sure I describe

4    that correctly.  I'm sorry.  That was the interior view was

5    Exhibit 10 for the record.  The interior view was Exhibit 10.

6    The exterior view I'm about to show is Exhibit 9.  And this

7    also starts at 26 minutes after 8:00, correct?

8    A    Yes.

9    Q    And this is the dashboard camera on the patty wagon you

10   were driving, correct?

11   A    Correct.  That's out the front windshield.

12   Q    I'm just going to play this.  It's three,

13   three-and-a-half minutes long.  I ask you to be patient, sir,

14   and just bear with me and let's watch the whole video.

15            (The video of Exhibit 9 was played to the jury.)

16   Q    (By Mr. Zoole)  I'm told that maybe it's not loud enough.

17   Can you hear the siren?

18   A    I can -- I can hear the sirens.  It's faint, but I can

19   hear them.

20   Q    Okay.  And that -- And that's the same siren that we

21   heard --

22   A    It is.

23   Q    -- on the interior view because these videos were running

24   simultaneously.  It's just one's outside and one's inside,

25   correct?

1    A    It's recorded simultaneously, yes.

2    Q    And that's the end of that video, correct?  At 8 -- also

3    at --

4    A    Yes.

5    Q    -- 8:29 and 39 seconds, correct?

6    A    Correct.

7    Q    And, again, that turned off because the same mechanism

8    that you used to turn off the interior camera turns off the

9    exterior camera, correct?

10   A    If you stop one, they stop them both.

11   Q    All right.  Now when you arrived at the scene -- Now this

12   is 39th and Cass, correct?

13   A    13th and Cass.

14   Q    13th and Cass, thank you.  And you see the old Greyhound

15   bus station that used to be there across the street?  The

16   vacant building?

17   A    Correct.

18   Q    And when you arrived at that scene, you're pretty sure

19   that you saw Mr. Tomlinson, Mr. Moton and Mr. Martorano

20   standing on the curb, correct?

21   A    I see three officers.  I couldn't tell you which one is

22   which.

23   Q    Okay.  Well, I'm looking at Page 39 of your deposition

24   where you were asked this question at Line 7.

25   A    Okay.

```
 1   Q    Do you recall this question:  "When you arrived at the
 2   scene, what officers did you see?"
 3        Answer:  "I would imagine it was Moton, Martorano and
 4   Tomlinson."
 5   A    Well, I would imagine.
 6   Q    Okay.  Do you have any reason to think it was anyone
 7   other than those three?
 8   A    No.  Like I said, I couldn't tell you which one is which.
 9   Q    I understand.  Were there any other officers there
10   waiting for you?
11   A    Not that I recall.
12   Q    It was decided, you say, to put Mr. Fletcher in the patty
13   wagon pretty soon after you arrived, correct?
14   A    Correct.
15   Q    Do you know Sergeant Simeone?
16   A    I know who he is.
17   Q    Okay.  How long have you known him?
18   A    I couldn't say.
19   Q    Well, and more than knowing who he is, you have -- you
20   have worked with him before.  You have transported him before,
21   correct?
22   A    Sergeant Simeone?
23   Q    Yes.  You have transported for him before, correct?
24   A    Probably.
25   Q    Okay.  And you were at the scene until you left with
```

```
1    Mr. Fletcher at 9:12 PM, correct?

2    A    I was at the scene until I left with Mr. Fletcher, yes.

3    Q    Okay.  And I think we already established from the radio

4    logs.  Do you remember that that was 9:12 PM?  Does that sound

5    right?

6    A    Okay.

7    Q    Okay.  Do you recall seeing Sergeant Simeone at the scene

8    at any time while you were there?

9    A    I don't recall.  He probably was.

10   Q    Okay.  But you don't recall seeing him there, do you?

11   A    Most of the time I was there, I was at the back of the

12   cruiser.

13   Q    You don't recall seeing Mister -- Sergeant Simeone there

14   at any time, correct?

15   A    No.

16   Q    Okay.  That is to say that's correct; you don't recall.

17   A    Correct.

18   Q    All right.  The camera was never turned back on again.  I

19   don't mean never ever in the world, but I mean ---

20   A    I know what you -- Yeah.

21   Q    With respect to this incident, --

22   A    Correct.

23   Q    -- it was not turned back on.

24   A    It was never reactivated.

25   Q    Okay.  I'm going to show you -- This is Exhibit 34.
```

1          MR. ZOOLE:  May I have the Elmo switched back,

2    please?

3    Q    (By Mr. Zoole)  This was an exhibit that you were shown

4    back in your deposition.  Do you recall seeing that before?

5    A    Yes.

6    Q    All right.

7          MR. ZOOLE:  And may I approach, Your Honor?

8          THE COURT:  Yes.

9    Q    (By Mr. Zoole)  Okay.  This is the order of the St. Louis

10   Police Department, the rules that were in effect regarding the

11   use of the camera at the time, correct?

12   A    Correct.

13   Q    And these were in effect as of March 6th, 2013?

14   A    It appears they were.

15   Q    As Mr. Fletcher was turned back into the patty wagon,

16   these rules would have required you to make sure the camera

17   was turned back on again, wouldn't they?

18   A    It should have been.

19   Q    Okay.  Why wasn't it?  Why didn't you turn the camera

20   back on again when Mr. Fletcher was being put into the patty

21   wagon?

22   A    I forgot.

23   Q    I'm sorry.  Did you say ---

24   A    I forgot.  I never left the back of the cruiser.  You got

25   to go to the ---

1   Q    There's no camera malfunction or battery problem or

2   anything like that.

3   A    Not to my knowledge.

4   Q    What was the reason that you were going to the scene for?

5   A    To transport.

6   Q    Okay.  So the reason for the -- for the event or your --

7   your action in the event was to go to the scene, pick up

8   Mr. Fletcher and transport him, correct?

9   A    Correct.

10  Q    I'd like you to look at the second page of that exhibit,

11  and I'd like you to look down at Rule B(1).  Would you read

12  B(1) out loud for us, please?

13  A    "Once the recording has been initiated, the in-car camera

14  system video processing unit equipment should record the event

15  until the action or reason for initiation has been completed.

16  This means if the recording is because of a traffic stop or

17  investigative stop, the recording shall not be stopped until

18  the officer has concluded the stop.  The recording shall not

19  be stopped during an emergency response or a pursuit until the

20  termination of same.  Some reasons for stopping a recording

21  are outlined in Section F(6)."

22  Q    Why -- Why did you turn off the camera when you arrived?

23  And you hadn't -- you hadn't transported Mr. Fletcher yet.

24  You hadn't put him into the car yet.  I understand why you

25  said why you didn't turn it back on again.  I want to know why

1    you turned it off.

2    A    It was activated because I activated my lights.  My

3    lights were shut off.  I turned the camera off out of habit.

4    Q    Out of habit.  Thank you.

5         I want to talk about the point where -- Well, let me

6    ask -- I said in my opening statement, you probably heard me

7    say it, that Mr. Tomlinson reported that he could see some

8    swelling to Mr. Fletcher's forehead and eye area.  The EMT

9    report has a -- has a cut that's bleeding on his forehead.

10   Did you notice any injuries on Mr. Fletcher at the scene?

11   A    I noticed the cut when he come to the back of the cruiser

12   for EMS.  The swelling I did not notice.

13   Q    And you did notice a cut to his head?

14   A    I did after he had already been in the cruiser for a

15   period of time or in the cage.

16   Q    And did you notice the cut bleeding?

17   A    I don't recall.

18   Q    But you noticed -- you noticed that injury, that cut;

19   correct?

20   A    I did notice he did have a small cut on his forehead.

21   Q    Do you recall -- I'm looking at Page 42 of your

22   deposition, the bottom starting at Line 24, going to the top

23   of 43 -- this question and this answer:

24        Question:  "At any point did you observe any injuries

25   to Mr. Fletcher at this time?  Any bleeding, cuts, anything

136

1   like that?"

2          Answer:  "Not that I recall.  I didn't look real hard

3   but not that I recall."

4   A    Okay.

5   Q    Do you recall that question and that answer?

6   A    I do.

7   Q    Okay.  Well, did you observe a cut on him that you

8   recall?  Were you looking real hard at his face or not?

9   A    I wasn't looking hard at his face, no.

10  Q    Okay.  He wasn't your prisoner as far as you were

11  concerned, correct?

12  A    Correct.

13  Q    So you weren't paying a ton of attention to him

14  personally while you were there, correct?

15  A    No.

16  Q    Okay.  You did observe Mr. Fletcher being taken to the

17  patty wagon, though; right?

18  A    Correct.

19  Q    He was -- His body, when he was taken to the patty wagon,

20  was pretty much limp, wasn't it?

21  A    I don't recall if it was or not.

22  Q    Okay.  Well, in your -- I'll refer to your deposition

23  now, Page 41, Line 10.

24          MR. LUEPKE:  Your Honor, I think this is improper

25  impeachment.  He's not said -- He just said he doesn't recall.

1    I don't know ---

2          THE COURT:  I'm going to overrule it.  It might be

3    easier if he had a copy of the deposition in front of him so

4    he could follow along with the question.

5          MR. ZOOLE:  Sure.  I have my own copy here, Judge.

6          THE COURT:  Is there an extra copy around?

7          MR. ZOOLE:  I could probably find one.

8          THE COURT:  All right.

9          MS. MUELLER:  I think we just have the designations,

10   Your Honor, not the whole thing.

11         THE COURT:  Okay.  Thank you.

12         MR. ZOOLE:  I do not have an extra copy.

13         THE COURT:  If you don't, it might be better if you

14   came up near the witness and showed him the copy, showed him

15   your copy so he can see exactly what it is you're referring

16   to.

17         MR. ZOOLE:  Sure.

18   Q    (By Mr. Zoole)  I'm looking at Page 41 of your testimony

19   at Lines 10 through Line 18, and you can read that to yourself

20   or out loud, your choice, but I'm just doing it so you can

21   refresh your memory.  Let me know when you finish reading.

22   A    Okay.

23   Q    So as Mr. Fletcher was being taken to the patty wagon,

24   his body was pretty much limp, wasn't it?

25   A    It says "probably."

1    Q    And that was your testimony.  And you were watching him

2    at the time, right?

3    A    I was looking behind me as I was walking to the back of

4    my cruiser to open it.  I wasn't fixated on him.

5    Q    So you're saying you did not see him being taken into the

6    patty wagon?

7    A    They were probably behind me.

8    Q    You're saying you did not see him put into the patty

9    wagon?

10   A    I was standing at the back of the cruiser when he was put

11   in.

12   Q    All right.  And the part you saw, his body was pretty

13   much limp, correct?

14   A    He was put in -- I don't know if "limp" would be the

15   correct word, but he was put into the back of the cruiser.

16   Q    Okay.  Well, let's -- let's -- let's read it together.

17   The question was:  "So he had to be carried" -- I'm at Line

18   13, Page 41.

19        Answer:  "He had to be dragged a little, yes.  He

20   drug his feet if I remember correctly."

21        Question:  "So he was kind of half carried up, half

22   dragged to the cruiser?"

23        Answer:  "His body was probably pretty much limp."

24   A    "Probably."

25   Q    Okay.  And that's what you observed, right?

1    A    As looking back, yes.

2    Q    Right.  Because you saw him being dragged a little,

3    correct?

4    A    Not the whole time.

5    Q    All right.  But the part you observed, he was being

6    dragged and he was limp, correct?

7    A    Probably.

8    Q    Now the officers laid Mr. Fletcher on his side in the

9    patty wagon and just sort of pushed him in, correct?

10   A    Correct.

11   Q    Did you look at his face when you were at the scene at

12   all?  Mr. Fletcher's face.

13   A    I looked briefly when he was brought back to the back of

14   the cruiser when EMS arrived.

15   Q    Okay.

16   A    Did I pay much attention to it?  No.

17   Q    All right.  When you got to The Justice Center, you

18   opened the patty wagon doors, correct?

19   A    Correct.

20   Q    And he was still lying on his side where you had left

21   him, correct?

22   A    For the most part, yes.  There's not a lot of room to

23   move around back there.

24   Q    And Mr. Fletcher did not say anything at that point,

25   correct?

1    A    Not that I can recall.

2    Q    And as other officers got him out of the patty wagon,

3    they held Mr. Fletcher such that if they let him go, he would

4    have just dropped to the ground, correct?

5    A    I don't know.  He was removed from the cruiser.  I closed

6    the doors and I left.

7    Q    I'm going to refer to your testimony at your deposition

8    on Page 56, Line 20, and I'll come up and hand it to you.

9         Do you recall this question and this answer, Page 55,

10   Line 20:  "Was he able or -- able to get on his feet and walk

11   at that time or were they having to carry or drag him?"

12        Answer:  "They held him up, if I recall, but he -- I

13   guess you could say that he walked, but they held him up.  If

14   they would have let him go, he probably would have just

15   dropped to the ground."

16        Was that your testimony?

17   A    Yes.

18   Q    And was that accurate testimony when you gave it?

19   A    Probably.

20   Q    You weren't paying much attention to his face at that

21   point either as he got out of the patty wagon, were you?

22   A    No.

23   Q    Okay.  I want to talk about when the EMTs arrived on the

24   scene --

25   A    Okay.

1    Q    -- at Cass and 13th.  That was while you were still

2    there, correct?

3    A    Correct.  We were still at the scene.

4    Q    Do you remember whether the EMTs talked with -- Well, let

5    me back up.  Let's describe those back doors a bit.

6         Did I -- Did I describe it accurately in opening

7    statement?  There's an inner cage door and an outer sort of

8    heavy door?

9    A    There are two sets of doors.  There's the cage doors and

10   then the outer van doors.

11   Q    And the cage door is metal, solid metal at the bottom,

12   but it's got a cage window up at the top, correct?

13   A    Correct.

14   Q    All right.  Did you open the inner cage doors for the

15   EMTs when they came to look at Mr. Fletcher?

16   A    I believe I did, yes.

17   Q    Okay.  Actually you don't recall whether they -- you

18   opened the doors for them and they talked to him or if they

19   just talked to him through the cage, do you?

20   A    Not specifically, no.

21   Q    Right.  As far as you remember, it could have been that

22   they were just talking to him through the cage doors, correct?

23   A    It's possible.

24   Q    It would be consistent with your memory, correct?

25   A    Sure.

```
 1   Q    Okay.  And they asked -- To your memory, they asked

 2   Mr. Fletcher if he was okay, the paramedics did, and he did

 3   not respond.  Isn't that correct?

 4   A    I don't -- I couldn't say whether that would be correct

 5   or not.

 6   Q    Okay.  Well, let me show you Page 48 of your deposition,

 7   Line 7.  Do you recall this testimony and your answer -- this

 8   question and your answer:

 9        Question:  "And so you said they -- they asked him if

10   he wanted medical attention and he just didn't respond?"

11        Answer:  "From what I recall, yes."

12        Do you recall that testimony?

13   A    Okay.

14   Q    Was that accurate?

15   A    Yeah.

16   Q    All right.  So they asked him if he wanted medical

17   attention, and he did not respond, correct?

18   A    Okay.

19   Q    There was a Refusal of Medical Care form.  Do you

20   remember talking about this?

21   A    It's computerized, but yes.

22   Q    It's computerized.  And the refusal form in these

23   situations is not signed by the person but it's, rather,

24   signed by an officer at the scene, correct?

25   A    Yeah.
```

```
 1    Q     Did you ever see Mr. Fletcher signing a form?

 2    A     No.  I'll guarantee he didn't sign it.  We're not going

 3    to uncuff a suspect, especially after resisting, to sign

 4    something like that.

 5    Q     Right.  And you don't even remember opening the cage

 6    doors to have him sign it, do you?

 7    A     I wouldn't have opened the cage door for him to sign it.

 8    Q     All right.  And you don't even remember opening the cage

 9    doors at all once he was in there, correct?

10    A     I believe I opened it up -- I believe I may have opened

11    it up for the medics, but ---

12    Q     Right.  Because you don't recall one way or another --

13    A     Correct.

14    Q     -- whether you opened it up for the EMTs or whether they

15    just spoke to him through the -- through the mesh cage.

16    A     Correct.

17    Q     I want to talk about the point when he's being taken --

18    Mr. Fletcher is being taken to the patty wagon.  Was he -- Was

19    he already outside when you arrived or was he in the patrol

20    car?

21    A     He was outside.

22    Q     All right.  Do you recall where he was at the time?

23    A     Not specifically, no.

24    Q     Was he lying on the ground somewhere?

25    A     I believe so.
```

1    Q    He was not inside the patrol car, though, at any rate

2    when you arrived.

3    A    No.

4    Q    Who actually took him from that spot on the ground --

5    A    I couldn't say.

6    Q    -- and moved him to the patty wagon?

7    A    I couldn't say.

8    Q    Were you among the people who did it?

9    A    I did not actually physically handle him, no.

10   Q    Do you remember how many people did it?

11   A    No.

12   Q    Do you remember specifically how many people were even

13   there when it happened, present at the scene?

14   A    No.

15   Q    How about generally?  Do you remember generally how many

16   people were there when you -- when that moment happened?

17   A    No.

18   Q    While you were at the scene, is it your testimony that

19   you did not observe Mr. Fletcher being tasered?

20   A    Correct.

21   Q    Were you looking at him the whole time?

22   A    Other than walking with him while he was being put --

23   being carried behind me, I wasn't -- other than that, he was

24   in the cage, so I couldn't necessarily see him.

25   Q    I'm going to show you the -- the Exhibit 13, the

1   downloaded log from the Taser that was used that evening at

2   the scene.  I want to give you an opportunity to tell me

3   whether at 8:52 on March 6th for a two-second blast and 8:56

4   on March 6th for a three-second blast, something like that

5   happened while you were there that you observed?

6   A    I didn't observe him being tased.

7   Q    Do you have any explanation as to how you could have been

8   at the scene watching Mr. Fletcher and the Taser log shows the

9   Taser was fired at those two moments and you didn't see it?

10  A    I can't explain it.

11        MR. ZOOLE:  I have no more questions.

12        THE COURT:  Any questions, Mr. Luepke?

13        MR. LUEPKE:  Yes, Your Honor.

14        THE WITNESS:  Would you like this back?  Sir, would

15  you like this back?

16        MR. ZOOLE:  Yeah.  Oh, Your Honor, before -- I'm

17  sorry.  May I introduce into evidence Exhibits 9, 10, 13, 15

18  and 34?

19        THE COURT:  Any objection?

20        MR. LUEPKE:  No, Your Honor.

21        THE COURT:  9, 13, 10, and 34?  Is that what you

22  said, Mr. Zoole?

23        MR. ZOOLE:  Yes, Your Honor.

24        THE COURT:  Are deemed admitted.

25        MR. ZOOLE:  And I'll leave the exhibits here at the

1    lectern.

2                        CROSS EXAMINATION

3    QUESTIONS BY MR. LUEPKE:

4    Q    Officer Carroll, could you describe for the jury what

5    your role was during this arrest of Mr. Fletcher on the night

6    of March 6th, 2013?

7    A    Simply to transport him from the scene to The Justice

8    Center.

9    Q    That was your sole function?

10   A    Correct.

11   Q    Did you ever touch Mr. Fletcher in any way?

12   A    Not that I can recall.

13   Q    You referred to something as a "cruiser."  It's also

14   called, I think, a "patty wagon."

15   A    Correct.

16   Q    Could you describe for the jury what that is?

17   A    It's a full-size van, cargo van, that the department puts

18   a steel cage for transporting prisoners in the rear of it.

19   Q    How many doors are in the back?

20   A    Two.

21   Q    What are those doors?

22   A    Well, four.  There's the two on the inner cage and then

23   the two for the actual body of the van.

24   Q    So in order to put an arrestee or prisoner into the van,

25   you have to first put them into the cage.  Is that right?

```
 1    A     Correct.

 2    Q     And then the cage doors are closed?

 3    A     The cage doors close first and then the outer doors are

 4    closed behind it.

 5    Q     What are the cage doors?  Could you describe those,

 6    please, for the jury?

 7    A     Steel doors.  Top half is like a mesh so you can see

 8    through it.  The bottom half is a solid plate.

 9    Q     So it's mesh on part of it?

10    A     Correct.

11    Q     And is it two doors or just one?

12    A     This cage was two.

13    Q     Was two, okay.  Prior to the night of March 6th, had you

14    ever seen or heard of Calvin Fletcher?

15    A     No.

16    Q     Did you have any dealings or interactions with

17    Calvin Fletcher after the night of March 6th of 2013?

18    A     No.

19    Q     Before today, when was the last time you ever saw

20    Calvin Fletcher?

21    A     That night.

22    Q     March 6th, --

23    A     Yes.

24    Q     -- 2013?

25    A     Yes.
```

```
1    Q    And please describe all of the interactions that you had

2    with Mr. Fletcher during the night of March 6th, 2013.

3    A    Physical interactions?

4    Q    Yes.

5    A    I -- I don't recall physically actually doing much of

6    anything with him other than removing him from the cruiser.

7    Q    All right.  You transported him?

8    A    I transported him, yes.

9    Q    Were you involved in putting him inside the cruiser?

10   A    I was there.  I did not -- I was not physically involved.

11   I was -- The street's concaved.  The doors -- There's like ---

12   Q    How many other officers then put Mr. Fletcher into the

13   cruiser?

14   A    I can't -- I couldn't tell you.  A couple probably.

15   Q    And during that process, did you have -- or did you

16   observe that process?

17   A    Slightly, yeah.  I was -- I was there.  I don't -- I

18   don't recall if I was paying too much attention to it.

19   Q    And did you observe whether or not Mr. Fletcher was

20   cooperating in that effort or was he dragging his feet?

21   A    No, he was not cooperating.

22   Q    And how would you describe how he was not cooperating?

23   A    He didn't want to go into the back of that cruiser.  He

24   was, more or less, forced into it.

25   Q    All right.  Do you recall the officers who were there
```

1    that were part of this effort to get Mr. Fletcher into the

2    back of the cruiser?

3    A    I do not.

4    Q    Do you recall how many officers there were in that

5    effort?

6    A    I do not.

7    Q    Do you know whether or not there's any officers involved

8    in that effort other than your co-Defendants in this case?

9    A    I don't know who they would be.

10   Q    Okay.  And do you recall there being anyone other than

11   these officers?

12   A    I'm sure there was.  The video -- Even the video shows

13   another car arriving right at the same time I did.

14   Q    Okay.  And would that be typical in this sort of arrest

15   situation?

16   A    Yeah.  Usually if we hear somebody having problems with a

17   customer, everybody comes up.

18   Q    Now let me ask you to back up.  The first time you heard

19   about this incident, the reason you went there, how did you

20   hear about it?

21   A    I heard the resisting, I believe it was.  I heard the

22   resisting come out on the radio, and they were calling for a

23   cruiser.  The 4th District cruiser was not available, so they

24   sent me.

25   Q    So the first word of -- that you heard, the reason why

150

1    you were there was that we have an incident of resisting

2    arrest.  Is that correct?

3    A    I believe so, yes.

4    Q    And it was initially reported as a resisting arrest to

5    you?

6    A    Yeah.

7    Q    And then how did you respond to that resisting arrest?

8    A    Lights and siren.

9    Q    Lights and siren?

10   A    Yes.

11   Q    And I think you testified that the video then

12   automatically comes up.

13   A    As soon as I -- As soon as the lights are activated on

14   any car containing the camera, the camera comes on

15   automatically.

16   Q    All right.  And how long did it take -- After getting

17   word of this resisting arrest, how long did it take for you to

18   arrive on the scene?

19   A    According to the video, three minutes.

20   Q    And when you arrived, what did you see?

21   A    I seen the car on the video.  The back door was open and

22   three officers standing towards the front of it.

23   Q    The back door of what?

24   A    The -- The -- I would believe it would be Tomlinson's

25   vehicle.

```
 1    Q    The police car?

 2    A    Yes, the police car.

 3    Q    Okay.  And I think you said you saw Mr. Fletcher sitting

 4    on the curb?

 5    A    He was up there.  I don't recall if he was sitting,

 6    laying down.

 7    Q    All right.  Did you observe Mr. Fletcher's behavior?

 8    A    I did not.

 9    Q    Did you see what Officer Tomlinson was doing at the time?

10    A    If he was one of the three standing up there, he was --

11    he was there.  He was standing there.  He wasn't doing

12    anything specific that I can recall.

13    Q    Did you see what Officer Moton was doing?

14    A    Same thing.

15    Q    And your testimony would be the same for Officer

16    Martorano?

17    A    Yes.

18    Q    Did you see any of these officers in any way strike

19    Mr. Fletcher?

20    A    Not while I was there.

21    Q    Did you learn that a Taser had been used?

22    A    No.

23    Q    Do you have any knowledge of any use of any Taser in this

24    incident?

25    A    Other than hearing it from here, no.
```

152

```
 1   Q     Did you hear or see at all what EMS, the paramedics, did
 2   when they came to the scene?
 3   A     I was there, yes.
 4   Q     You saw paramedics arrive?
 5   A     Correct.
 6   Q     What happened after they arrived?
 7   A     They pretty much checked on Mr. Fletcher, and nothing was
 8   going to be done.  He wasn't going to go to the hospital.  He
 9   refused treatment.  He didn't want to be treated, so they
10   left.
11   Q     All right.  What was then your next involvement?
12   A     Eventually he was transported to The Justice Center.
13   Q     And you drove the van?
14   A     Correct.
15   Q     Back to The Justice Center?
16   A     Correct.
17   Q     Mr. Fletcher was in the back at that time?
18   A     Yes.
19   Q     All right.  Did you observe what Mr. Fletcher was doing
20   in the back of the van?
21   A     I don't believe I did.
22   Q     Is there -- Was there a video on of what was going on in
23   the back of the van?
24   A     The camera was not activated.  It was there, but it was
25   not activated.
```

1    Q    All right.  And why was it not activated?

2    A    I forgot.

3    Q    Was that a mistake on your part?

4    A    Yes.

5    Q    So we don't have a video of what happened in the back of

6    the van during the three-minute drive from the scene of the

7    arrest to The Justice Center.  Is that right?

8    A    From the time it took from the scene to The Justice

9    Center, no.  I don't know how long it -- how long it would

10   have been, but ---

11   Q    Okay.  But you did see Mr. Fletcher then when you got to

12   The Justice Center?

13   A    Correct.

14   Q    Did you notice any injuries, any -- any type of harm?

15   A    Other than the one cut on his forehead that we already

16   noted, no.

17   Q    So in other words, other than -- Mr. Fletcher looked

18   exactly the same getting out of the van and as he did when he

19   went into the van, correct?

20   A    Correct.

21   Q    All right.  And did you assist at all in helping

22   Mr. Fletcher get out of the van?

23   A    I don't recall if I did.  I don't -- I don't recall if

24   the other officers who were there removed him or if I actually

25   helped.

1    Q     How does it typically happen?  Are there other officers

2    at The Justice Center that help you remove a suspect from a

3    van?

4    A     When it pertains to resisting, the original officers that

5    were on scene are not allowed to have contact with the

6    prisoner.  So they have to have other officers that are on

7    duty actually book the prisoner.

8    Q     Did any of these defendant officers go with you to The

9    Justice Center?

10   A     I do not believe so, no.

11   Q     And that's pursuant to the policy that you just ---

12   A     Correct.  Correct.

13   Q     Once there's a resisting, the arresting officers then no

14   longer have any contact with the suspect?

15   A     Correct.

16   Q     Okay.  So would there have been some other officers there

17   to help you get Mr. Fletcher out?

18   A     There were other officers there.  I just -- I couldn't

19   tell you who they are.

20   Q     Okay.  Did you at any time ever speak to Doctor -- to

21   Mr. Fletcher?

22   A     No.

23   Q     And knowing what you know now, what would you have done

24   differently in your treatment of Mr. Fletcher?

25   A     Treatment of him?  Probably nothing.  I would have turned

1    the camera on.

2    Q    Have you ever been sued before as a police officer?

3    A    No.

4    Q    Have you ever had any complaints that were filed against

5    you in the past?

6    A    No.

7         MR. LUEPKE:  Thank you for your service, Officer.

8    Much appreciated.

9         THE WITNESS:  Thank you.

10        THE COURT:  Redirect?

11                    REDIRECT EXAMINATION

12   QUESTIONS BY MR. ZOOLE:

13   Q    When -- When you told Mr. Luepke just now that while

14   being taken into the patty wagon, he was not cooperating; he

15   didn't want to go; he was, more or less, forced into it;

16   that's because, as far as you could observe, his body was

17   pretty much limp, right?

18   A    It's possible.

19   Q    When you arrived, you saw Mr. Fletcher lying down on the

20   ground on his side, correct?

21   A    I believe he was laying down.  I believe so.  He -- I

22   don't know exactly what position he was in.

23   Q    But he was lying on the ground.

24   A    He was on the ground.

25   Q    He was lying on the ground on his side, right?

1    A    He was on the ground.

2    Q    Okay.  Well, let me -- let me -- Page 39.  I'm going to

3    point out Page 39, Line 40 or -- I'm sorry -- Line 20.  The

4    question leading up to it was:

5              Question:  "Where was Mr. Fletcher as you walked up?"

6              Answer:  "On the ground."

7              Question:  "Was he on his stomach or his back?"

8              Answer:  "I believe he was kind of on his side,

9    stomach side if I remember correctly.  I'm not positive about

10   that."

11             Was that testimony accurate?

12   A    Yes.

13   Q    Okay.  Well, he wouldn't be sitting down if he's on his

14   stomach or his side, right?

15   A    Correct.

16   Q    He'd be lying down.

17   A    Correct.

18   Q    So he was lying down on the ground when you arrived,

19   right?

20   A    You can assume that, yes.

21   Q    And you told me that when the paramedics asked him if he

22   wanted any treatment or if he was all right, he didn't answer.

23   Is that what you meant when you said that he refused

24   treatment?  His not answer?

25   A    Yes.

```
 1              MR. ZOOLE:  Thanks.  I have no more questions, Judge.

 2              THE COURT:  May Officer Carroll step down?

 3              MR. LUEPKE:  Yes, Your Honor.

 4              THE COURT:  Officer Carroll, you may step down.

 5              Would counsel, please, approach sidebar?

 6              (Bench conference on the record with counsel and the

 7    Court:)

 8              THE COURT:  Do you have another witness we can take

 9    up tonight before we recess?

10              MR. TATLOW:  We have to go through on Berns all of

11    the things, the counter-designations.

12              MR. ZOOLE:  Our next -- Our next witness would either

13    be Dr. Berns' deposition or we can put Mr. Fletcher on, and

14    I'm afraid that would take more than an hour.

15              THE COURT:  How about Dr. Berns' deposition?

16              MR. TATLOW:  Well, ---

17              MR. LUEPKE:  I think we -- we can probably get

18    started.

19              MR. TATLOW:  We kind of were -- We had to go through

20    some of the designations and see what they agree and disagree

21    with.  I was going to try to cut it way down so that we can

22    speed this thing up.

23              MR. LUEPKE:  I mean why don't you go ahead and ---

24              THE COURT:  If we broke for tonight and you worked on

25    cutting it down, that might be helpful to try to put it
```

1    all ---

2            MS. MUELLER:  That would give us a chance to review

3    it.

4            MR. TATLOW:  I could -- I could meet with opposing

5    counsel.  And if the clients would leave and we could meet, we

6    could just cut down to the bare essential probably.

7            THE COURT:  And get it on tomorrow.  And then how

8    many more witnesses would you have tomorrow?

9            MR. ZOOLE:  Four tomorrow.

10           THE COURT:  Berns, Fletcher.

11           MR. ZOOLE:  Right, and then the three officers.  Then

12   I -- We may rest.  There are a couple of "I don't knows."

13           THE COURT:  I want you to try to rest.

14           MR. ZOOLE:  Pardon me?  I think we would rest

15   tomorrow.

16           THE COURT:  If -- If you're going to call the

17   officers, then that doesn't leave you very much to do --

18           MR. LUEPKE:  No.

19           THE COURT:  -- because they're on the stand.  You'll

20   get a chance to cross -- question them, not cross-examine

21   them, but question them.

22           MR. LUEPKE:  That's exactly what I would do, yes.

23           THE COURT:  All right.  So here's what I'm thinking:

24   We're going to go as far as we can go tomorrow.  Hopefully

25   late -- late tomorrow afternoon before we finish we get to the

```
1    jury instructions and have that done, and then Wednesday

2    morning do whatever else we need to do and hopefully get this

3    case to the jury.  And that will give you all night tomorrow

4    night to decide what it is you want to say to them.

5              MR. TATLOW:  Yeah.

6              THE COURT:  Is that fair enough?

7              MR. TATLOW:  That sounds reasonable.

8              THE COURT:  All right.  So what I'm going to do is

9    have the jury dismissed for tonight, and you all work out

10   those depo designations, and we'll take it up in the morning

11   at 9:00.

12             MS. MUELLER:  Okay.

13             MR. TATLOW:  All right.  Thank you, Your Honor.

14             MR. LUEPKE:  Thank you, Your Honor.

15          (End of discussion at side bar.)

16             THE COURT:  Members of the Jury, I have some work to

17   do with the lawyers, so we're going to break for the evening.

18             Remember as I have informed you before, during this

19   recess and every other recess, do not discuss this case among

20   yourselves or with anyone else, including your family and

21   friends.  Do not allow anyone to discuss the case with you or

22   within your hearing.  "Do not discuss" also means do not

23   e-mail, send text messages, blog or engage in any other form

24   of written, oral or electronic communication as I have

25   instructed you before.
```

1          You're going to be excused till tomorrow morning at

2    9:00 AM.  You should report to the Jury Room in the back.

3          THE CLERK:  All rise.

4          (Jury excused from the courtroom.)

5          (Court adjourned at 4:20 PM.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE OF OFFICIAL REPORTER</u>

        I, Deborah A. Kriegshauser, Federal Official Realtime
Court Reporter, in and for the United States District Court
for the Eastern District of Missouri, do hereby certify that
pursuant to Section 753, Title 28, United States Code, that
the foregoing is a true and correct transcript of the
stenographically-reported proceedings held in the
above-entitled matter and that the transcript page format is
in conformance with the regulations of the Judicial Conference
of the United States.

        Dated this 26th day of August, 2016.


                        /s/ Deborah A. Kriegshauser
                        _____
                        DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                        FEDERAL OFFICIAL COURT REPORTER